UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

OLDNAR CORPORATION
f/k/a Nartron Corporation,
a/k/a Gen X Microsystems, Inc.,

       Plaintiff,

v.

SANYO NORTH AMERICA
CORPORATION et al.,

       Defendants.
_____/

Case No. 1:13-cv-1064

HON. JANET T. NEFF

## **OPINION**

Pending before the Court in this diversity case is Plaintiff Nartron Corporation's Motion for Summary Judgment pertaining to Defendant Sanyo North America Corporation (Dkt 163); Sanyo has filed a Response and Cross-Motion for Summary Judgment (Dkt 165). Nartron has filed a Reply (Dkt 170), and Sanyo has filed a Surreply (Dkt 173). Having fully considered the parties' submissions, the Court concludes that oral argument would not assist in the disposition of the issues presented. *See* W.D. Mich. LCivR 7.2(d).

For the reasons that follow, Nartron's motion for summary judgment is denied; Sanyo's cross-motion for summary judgment is denied as to the breach of contract claim, but granted as to the unjust enrichment claim.

### **I. Background**

Plaintiff Oldnar Corporation, f/k/a Nartron Corporation, a/k/a Gen X Microsystems, Inc.,[1]

---

[1] The parties refer to Plaintiff as "Nartron" in the briefs, as will the Court herein.

filed this breach of contract case against Defendant Sanyo North America Corporation, alleging two counts in its Corrected Second Amended Complaint: Count 1—Breach of Contract (Development and Supply Agreement); and Count 2—Unjust Enrichment (Dkt 70).[2]  Nartron seeks recovery related to the development of touch screen technology that Sanyo allegedly used in touch screen displays for certain Cadillac vehicles, the "CUE," which Sanyo sold to GM.  Plaintiff has also named Panasonic Corporation of North America as a Defendant on the basis of Panasonic's successor interest.  The instant motion involves only Defendant Sanyo.

## II. Stipulated Facts

Pursuant to this Court's dispositive motion procedures, the parties have filed a Joint Statement of Material Facts (JSMF, Dkt 166), which sets forth the following facts for purposes of the motions (identified by the corresponding numbered paragraph in the JSMF).

1. Nartron and Sanyo entered into a Development and Supply Agreement ("the DSA") dated April 8, 2008 (Jt. Ex. 1).[3]

2. In 2007 and 2008, Sanyo relied on vendors to provide capacitive touch technology and did not have the capability to do capacitive touch technology on its own (Jt. Ex. 8 at 63:24–64:23).

3. On April 24, 2009, Nartron issued a quotation to Sanyo, which referred to "Quotation 803127.02," for building one of the alpha prototypes that would be shown to GM (Jt. Ex. 11, 4-24-09 Quotation).

---

[2] Nartron filed a previous case against Sanyo in February 2013 involving this same contract dispute, which was voluntarily dismissed, Case No. 1:13-cv-196 (W.D. Mich. 2013).

[3] This date appears to be in error as the DSA is dated April 2, 2008 (Dkt 167-1 at PageID.1988, 1999-2000).

4. Attached to the quotation was an unsigned product agreement for the Nartron prototypes.

5. On May 28, 2009, Sanyo issued a purchase order to Nartron for prototype units that utilized Nartron's touch screen systems. This purchase order referred to "Quotation 803127.02" (Jt. Ex. 12).

6. On September 14, 2009, Nartron sent Sanyo an invoice for "Module, Center Stack Smart Touch based on Phase 3 Configuration" for quotation number 803127.02 in the amount of $55,557.37 (Jt. Ex. 13).

7. Sanyo paid Nartron $55,557.37 under this purchase order on October 9, 2009 (Am. Compl. ¶¶ 39, 40).

8. In 2009, GM issued an RFQ to Sanyo for the purchase of a production version of the centerstack containing capacitive touch technology to be installed in Cadillac vehicles (referred to as the "Cadillac CUE").

9. On June 10, 2009, Sanyo issued an RFQ to Nartron for supplying the capacitive touch technology for the Cadillac CUE. In response, on June 15, 2009 Nartron issued a quote to Sanyo for the iQ Power™ System (Jt. Ex. 41, 6-15-09 Quotation).

10. Sanyo informed Nartron of its decision not to use Nartron as a supplier for the Cadillac CUE on November 11, 2009 (Jt. Ex. 45, 11-11-09 Email from B. Lim).

### III.  Legal Standards

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The court must consider the evidence and all reasonable inferences in favor of the nonmoving party.

*Burgess v. Fischer*, 735 F.3d 462, 471 (6th Cir. 2013); *U.S. S.E.C. v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321, 327 (6th Cir. 2013) (citation omitted).

The moving party has the initial burden of showing the absence of a genuine issue of material fact. *Jakubowski v. Christ Hosp., Inc.*, 627 F.3d 195, 200 (6th Cir. 2010). The burden then "shifts to the nonmoving party, who must present some 'specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "There is no genuine issue for trial where the record 'taken as a whole could not lead a rational trier of fact to find for the non-moving party.'" *Burgess*, 735 F.3d at 471 (quoting *Matsushita Elec. Indus., Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). "The ultimate inquiry is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Sierra Brokerage Servs.*, 712 F.3d at 327 (quoting *Anderson,* 477 U.S. at 251-52).

The parties seek to resolve this case through cross-motions for summary judgment. "[T]he standards upon which the court evaluates the motions for summary judgment do not change simply because the parties present cross-motions." *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991). "[T]he court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Id.* (quoting *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed. Cir. 1987)); *see also B.F. Goodrich Co. v. U.S. Filter Corp.*, 245 F.3d 587, 592-93 (2001). The Court considers the cross-motions accordingly.

### IV. Analysis

Nartron moves for summary judgment on the ground that there is no genuine dispute of

material fact as to two questions:

(1) whether Sanyo breached its contract with Nartron and must pay a royalty if Nartron know-how was necessary for Sanyo to make the CUE system; and

(2) whether Nartron know-how was necessary for Sanyo to make the CUE system.

(Mot., Dkt 163 at PageID.1921).

Nartron advances three primary propositions in its brief to support summary judgment.[4] First, "the contract [DSA] between Sanyo and Nartron provides for the payment of a 10% royalty if Nartron's know-how was necessary for Sanyo to make the CUE" (Dkt 164, PageID.1939). Second, Nartron "provided necessary intellectual property in the form of know-how that made it possible for Sanyo to make the CUE system" (*id.* at PageID.1948). Third, "[e]ven if the Court finds that no agreement exists between the parties, or that the agreement does not cover the service Nartron provided, Nartron may recover on a theory of unjust enrichment" (*id.* at PageID.1950).

Sanyo counters that the Court must enter summary judgment in its favor on Nartron's breach of contract claim because: (1) there is no Product Agreement that would give rise to an obligation to pay a license fee (Dkt 165 at PageID. 1967); (2) Nartron's technology is not in the CUE, nor was it necessary to make the CUE (*id.* at PageID.1973); and (3) there was no unjust enrichment as a matter of law because there is an express contract that governs the same subject matter (*id.* at PageID.1976).

### A. Breach of Contract

The parties agree that Michigan law applies with respect to the contract dispute, but they

---

[4]The Court addresses the arguments as presented by Nartron, although the arguments are somewhat overlapping.

disagree that any basis exists for payment to Nartron under the language of the contract, the DSA.

Under Michigan law "[a] court's primary responsibility in construing a Michigan contract is to ascertain and enforce the intent of the parties." *Wonderland Shopping Ctr. Venture Ltd. P'ship v. CDC Mortg. Capital, Inc.*, 274 F.3d 1085, 1092 (6th Cir. 2001). "It is a court's obligation to determine the intent of the parties by examining the language of the contract according to its plain and ordinary meaning. If the contractual language is unambiguous, courts must interpret and enforce the contract as written, because an unambiguous contract reflects the parties' intent as a matter of law. *In re Smith Trust*, 745 N.W.2d 754, 757-58 (Mich. 2008) (citations omitted); *see also Wonderland Shopping,* 274 F.3d at 1092 ("If the parties' intent is unambiguously clear from the language of the written agreement, the court must enforce the parties' intent as expressed in the writing."). "However, if the contractual language is ambiguous, extrinsic evidence can be presented to determine the intent of the parties." *In re Smith Trust*, 745 N.W.2d at 758 (citation omitted).

### 1. The Contract

The parties negotiated and signed a DSA (Development and Supply Agreement), dated April 2, 2008, which is at the center of their dispute.[5] The DSA does not identify specific products to be developed and/or supplied. It instead is an agreement covering the parties' joint endeavors and relationship as set out at the beginning of the DSA in a series of "Whereas" clauses, as follows:[6]

> WHEREAS, the Parties are interested in developing a relationship whereby Sanyo or Nartron, or the Parties Jointly, will conduct engineering projects to develop

---

[5]Nartron asserts that although the DSA is dated April 2, 2008, the parties continued negotiating terms of the Agreement for months after that date, which, according to Nartron, suggests that the parties backdated the DSA (Dkt 163 at PageID.1931).

[6]For purposes of this motion, the Court has not corrected what appear to be typographical or grammatical errors in the DSA.

products directed at Original Equipment Manufacturer customers of Parties ("Products").

WHEREAS Nartron:

- Has resources and experience in designing, developing and manufacturing innovative products including components, sub-systems and systems employing electronic and electro mechanical technologies for Original Equipment Manufacturer applications (hereafter "Nartron Products);

- Products relating to design and/or development included but not limited to the following:

    - Non-contact solid state sensing and control
    - Smart Touch® Center Stack
    - Electronic control modules

- Wishes to manufacture for Sanyo Products or components and subsystems developed in the pursuit of the Products.

- Wishes to have Sanyo manufacture components or sub-systems as a contract manufacturer.

WHEREAS Sanyo:

- Designs, develops and manufactures systems, sub-systems, and components, for use in Original Equipment Manufacturer applications;

- Wishes to source to Nartron any or all parts of design, development and manufacture of Products (primarily components and sub-systems containing electro mechanical, electrical and/or electronic components); and

- Wishes to utilize Intellectual Property, technology, know-how, patents, trade secrets and non-patentable inventions owned or created by Nartron and/or Sanyo, applied to Products.

- Wishes to manufacture products, components and sub-systems on a contract basis for Nartron.

NOW, THEREFORE, the Parties agree as follows:  ….

The DSA continues on to set forth a number of provisions defining the nature and scope of the activities governed and the parties' duties and obligations. The parties' instant dispute focuses in particular on those sections relating to Products, Product Agreements, and the payment of a licensing fee. Section 1 of the DSA defines key terms, including "Products":

> 1.8 "Products" shall mean Products individually identified in Product Agreements that shall define the scope, business objectives and responsibilities of the Parties.

Section 2 of the DSA provides for the "Development of Product Agreements" as follows:

> 2.1 The Parties agree to jointly identify Products to be covered under the Product Agreement. The Parties shall create a Statement of Work for each Product, which shall contain at least the following elements:
>
> > 2.1.1 Business objective: volume, price target, customer(s), general performance objective.
> > 2.1.2 Technical specification or in the alternative, a development program or contract to develop such a Product through Proof-of-Concept.
> > 2.1.3 Timeline (including SOP) and completion date of Product Agreement.
> > 2.1.4 Responsibilities of each Party in a form with specific deliverables.
> > 2.1.5 Program Management (scope and responsibility).
> > 2.1.6 Cost sharing or expense absorption.
> > 2.1.7 Tooling responsibility (prototype and/or volume production).
> > 2.1.8 Any other related costs or exposures.
>
> 2.2 The Product Agreement and Statement of Work must be agreed by both Parties.

Section 3 of the DSA is titled "Funding Products" and provides:

> Sanyo and Nartron will each bear its own development and prototype cost for a Product unless customer funded. The customer funded sharing will be defined in the Product Agreement. It is agreed that the Parties will identify in the Product Agreement the Lead Party and said Lead Party will primarily provide and bear the cost of personnel resources related to market, customer and regulatory requirements and will provide whole system testing and design services where applicable. The Parties will primarily provide and bear the personnel and other costs of component selection, fabrication, prototype build and component testing support.

Section 4 of the DSA addresses the "Exclusive Relationship for Products" and provides:

> Parties will have, in addition to any rights arising under this Agreement, the right to sell to any customer, Products developed under any Product Agreement and its related statement of work to such customer if, and only if it is mutually determined that the Lead Party fails to (a) use commercially reasonable efforts to market and sell Products or, (b) obtain the award of Products at such customer or, (c) purchase Products from identified preferred supplier source or, (d) a customer refuses to purchase Products from the Lead Party. Parties shall hold all ownership and licensing rights to all Products developed or produced under this Agreement if they are not incorporated into, or made the subject of, a Product Agreement, unless otherwise agreed, in writing, between Nartron and Sanyo.

Section 5 of the DSA contains provisions relating to "Preferred Supplier/Exclusive Status," including licensing, which provide in relevant part:

> 5.1   Nartron or Sanyo shall be designated as a Preferred Supplier (Seller) or Lead Party (Buyer) for each Product Agreement that is incorporated into an Original Equipment Manufacturer component, sub-system or system to be sold by the Parties to an Original Equipment Manufacturer (hereafter a "Parties System"). Subject to the provisions of Section 4, Preferred Supplier (seller) shall be awarded a three-year exclusive supply or 100% of Parties requirements for Products having a Product Agreement. Such three year exclusive supply period shall start from the effective date of Product Agreement. Notwithstanding the above, each Product Agreement contains financial obligations and/or compensation; Parties reasonable costs incurred and its lost profits and in the event the product is voided by the Parties, per Section 4.
>
> 5.2   This exclusive period shall not bind the Parties in the event that one of the Parties is unable to deliver acceptable Products on-time to meet the Parties reasonable lead times (quoted lead times) or poor quality. Further, the Parties agree to assist each other in identifying an alternate supplier, acceptable to the Lead Party, to assure uninterrupted Product supply. The Parties also agree to license to the other Party all industrial and intellectual property owned by the Party that is necessary for the Party to make or have made such Products. Unless otherwise defined in a product agreement the license is at 10% of the "Lead Parties System" sale price to a customer of the "Parties System" or any variants made. Each Product Agreement will specify the License, technology access and know-how and License rate. The Parties may not assign this Agreement (by operation of law or otherwise) without the prior written consent of the other Party, which consent shall not be unreasonably withheld or delayed. This Agreement shall be binding upon

>and inure to the benefit of the Parties hereto and their respective permitted successors and assigns.  Any attempt by a Party to assign this Agreement other than as permitted in this Agreement shall be null and void.  The License is non-transferrable by acquisition or sale by the Parties without written approval of the other Party.

(S*ee* Jt. Ex. 1, Dkt 167-1, at PageID.1989-1991).[7]

Addendum 1 to the DSA is a blank Product Agreement form, that would identify the Product and specify details in three sections:  Scope, Business Objective, and Responsibilities.  A fourth section, "Cost Sharing" has no blank lines to complete, and provides:

>Sanyo will issue Purchase Orders for prototypes used throughout development.  Costs to be agreed upon through the RFQ/Quotation process.
>
>Personnel costs of participating in normal program reviews, testing, or other usual product development activities will be the responsibility of each individual company.  Circumstances requiring unusual expenditures will be covered by mutual agreement before the event, through the RFQ/quote process.

(Dkt 167-1 at PageID.1996).

### 2. Nartron's Motion

Nartron states that the DSA is not a clearly written document; thus, Nartron argues that under general contract rules:  (1) the contract must be construed to enforce the intent of the parties; (2) at worst, the DSA is ambiguous, and the court must look to extrinsic evidence to resolve the ambiguity; and (3) the full weight of the extrinsic evidence supports resolving any ambiguity in favor of an interpretation that rewards Nartron if Nartron's know-how is incorporated into the CUE system, which it was.  Alternatively, Nartron argues that Sanyo breached the contract by refusing to name Nartron as a preferred/exclusive supplier.

---

[7]Although the DSA contains a number of additional provisions, which may be relevant in subsequent proceedings, the parties have not placed them at issue in the instant motions.

As an initial matter, Nartron asserts that the DSA "contains many typos and terms appear to have different meanings or conflicting meanings at different points in the document," and the DSA "is unclear as to key provisions" and "is unintegrated" (Dkt 164 at PageID.1940). Nartron advances several arguments to support this Court's resolution of ambiguity in the DSA in favor of Nartron and the award of a royalty. These arguments all involve some variation of reliance on limited extrinsic evidence, including hindsight deposition testimony, to interpret the DSA in Nartron's favor. In short, the Court finds none of these arguments legally supportable or persuasive.

Nartron first argues that evidence beyond the contract shows that the parties understood that Nartron would be compensated for the use of its technology and know-how. Nartron relies on deposition testimony of its vice-president, John Washeleski ("Either I'm going to make the product for [Sanyo] or I'm going to somehow have you pay me a royalty if I don't make it"), and statements by former Sanyo vice-president Reid Sigety, and an email communication to GM in which he explained: "The royalty for the software is the revenue source of [Nartron]; giving that right away is not congruent with their business model, and as such they will not permit us to disclose this without assurance that their business model is protected" (Jt. Ex. 2, Dkt 167-2 at PageID. 2003; Jt. Ex. 15, Dkt 167-14 at PageID.2068).

The Court declines to "construe" the contract based on such limited alleged statements of the parties' intent, as Nartron urges. These statements reflect no contractual agreement, let alone mutual intent to pay Nartron a 10% royalty with regard to Sanyo's ultimate sale of the CUE to GM.

Nor is the Court persuaded by Nartron's similarly-wishful summary judgment argument that "[a]t worst, the DSA is ambiguous and the Court must look to extrinsic evidence to resolve the ambiguity" (Dkt 164 at PageID.1941). Nartron asserts that the DSA is ambiguous as to several key

11

terms, including "Product," "Product Agreement," and Parties System," and "as to how and when a royalty should be assessed and how Nartron would be compensated if Sanyo uses Nartron's know-how or other intellectual property" (*id.* at PageID. 1942-1943). Nartron points to alleged conflicting interpretations of all these terms based on various references in different contexts in the DSA. Nartron also cites evidence such as: (1) the deposition of the attorney for Sanyo who assisted in drafting the DSA, in which he was unable to provide definite conclusions about the disputed key terms and the contractual requirements; (2) previously referenced statements of Washeleski and Sigety concerning the parties' alleged contractual expectations; and (3) Nartron's cooperation and assistance in building a prototype for Sanyo. Nartron acknowledges that "it is generally true that the meaning of an ambiguous contract is an issue of fact," but argues that "the full weight of the extrinsic evidence supports Nartron's conclusion that the Parties intended the agreement to provide payment to Nartron in exchange for services that made it possible for Sanyo to sell technology to GM" (Dkt 164 at PageID.1944).

Nothing in the above-quoted key contract provisions, or in any other provisions in the DSA—supports construing the contract on summary judgment to entitle Nartron to a royalty for an alleged use of its "know-how" in the CUE System. And even if the extrinsic evidence cited by Nartron were properly considered, it yields no different result. Such evidence only adds to the factual issues surrounding the questions presented by Nartron, which are inappropriate for resolution by this Court on summary judgment.

"It is well settled that the meaning of an ambiguous contract is a question of fact that must be decided by the jury." *Klapp*, 663 N.W.2d 453-54. "'Where a contract is to be construed by its terms alone, it is the duty of the court to interpret it; but where its meaning is obscure and its

construction depends upon other and extrinsic facts in connection with what is written, the question of interpretation should be submitted to the jury, under proper instructions.'" *Id.* at 454 (quoting *O'Connor v. March Auto. Irrigation Co.*, 218 N.W. 784, 787 (Mich. 1928) (citation omitted)). Stated differently:

> Although it is generally the duty of the court, not the jury, to construe written contracts and to define what is and what is not within their terms, where its meaning is obscure and its construction depends on other and extrinsic facts in connection with what is written, the question of interpretation should be submitted to the jury, with proper instructions. The rationale behind submitting the question to the jury is that where a written contract is ambiguous, a factual question is presented as to the meaning of its provisions, requiring a factual determination as to the intent of the parties in entering the contract; thus, the fact finder must interpret the contract's terms, in light of the apparent purpose of the contract as a whole, the rules of contract construction, and extrinsic evidence of intent and meaning.

4A MICH. PL. & PR. § 36:781 (2d ed.) (citing *Curbelo v. Bd. of Trs. of Comty. College Dist. of Macomb Cnty.*, 196 N.W.2d 843 (Mich. Ct. App. 1972) and *Klapp*, 663 N.W.2d 447).

Nartron argues, alternatively, that Sanyo breached the contract by refusing to name Nartron as a preferred/exclusive supplier under § 5.1 of the DSA. Nartron asserts that none of the conditions that would allow Sanyo to avoid this obligation were present, as no evidence questions the quality of the parts Narton supplied nor Nartron's ability to meet the necessary lead time for delivery of parts (*see* DSA §§ 5.1, 5.2). Sanyo argues to the contrary that there is nothing in the Agreement that requires Sanyo to designate Nartron as a Preferred Supplier in the absence of a Product Agreement. The Court agrees that Nartron's alternative agreement is undermined by the unambiguous language of the DSA, as Sanyo contends.

Section 5.1 of the DSA provides, in relevant part: "Nartron or Sanyo shall be designated as a *Preferred Supplier* (Seller) or Lead Party (Buyer) *for each Product Agreement* that is incorporated into an Original Equipment Manufacturer component, sub-system or system to be sold by the Parties

to an Original Equipment Manufacturer (hereafter a 'Parties System').  Preferred Supplier (seller) shall be awarded a three-year exclusive supply or 100% of Parties' requirements *for Products having a Product Agreement*.  Such three-year exclusive supply period shall start *from the effective date of Product Agreement*."  (Jt. Ex. 1, Dkt 167-1 at PageID.1991; emphasis added).

Thus, a Preferred Supplier is to be designated only for a Product Agreement, with the supply period to begin at the effective date of the Product Agreement.  Nartron acknowledges, and the record confirms, that there is no signed Product Agreement between Nartron and Sanyo for the sale of systems to GM utilizing Nartron technology (*see* 6/8/15 Tr., Dkt 156 at PageID.1893); thus § 5.1 of the DSA is not implicated, nor is the exception to Preferred Supplier/Exclusive Status under § 5.2 applicable.  Accordingly, under the unambiguous language of the DSA, Nartron is not entitled to summary judgment based on Sanyo's failure to designate Nartron as a Preferred Supplier.

### 3. Sanyo's Motion

Sanyo moves for summary judgment in its favor on the ground that under the terms of the DSA, Nartron cannot prevail on the breach of contract claim for payment of a royalty in the absence of a Product Agreement, and there is no Product Agreement that would give rise to an obligation for Sanyo to pay a license fee.

Sanyo argues that nothing in the Agreement requires Sanyo to pay for a licensing fee in the absence of a Product Agreement.  Sanyo points to § 5.2 of the DSA, which provides in relevant part:

> The Parties also agree to license to the other Party all industrial and intellectual property owned by the Party that is necessary for the Party to make or have made such Product(s).  *Unless otherwise defined in a product agreement the license is at 10% of the "Lead Parties System" sale price to a customer of the "Parties System" or any variants made.*

(Emphasis added).  Sanyo further points to § 1 of the DSA, "Definitions," which states:

> "Products" shall mean Products individually identified in Product Agreements that shall define the scope, business objectives and responsibilities of the Parties.

(DSA § 1.8, Dkt 167-1 at PageID.1989). Sanyo thus contends that the license fee contemplated by the Agreement required the identification and specification of "Products," i.e. "Products individually identified in Product Agreements."

Sanyo states that, more importantly, the payment of a license fee under the DSA is predicated upon the existence of a "Parties System," which cannot exist without a Product Agreement, pursuant to § 5.1 of the DSA, which states in relevant part:

> Nartron or Sanyo shall be designated as a Preferred Supplier (Seller) or Lead Party (Buyer) for each Product Agreement that is incorporated into an Original Equipment Manufacturer component, sub-system or system to be sold by the Parties to an Original Equipment Manufacturer (*hereafter a "Parties System"*).

(Emphasis added). Sanyo asserts that in this case, there is no "Product Agreement," and therefore no "Parties System." And because there is no "Parties System," there is no basis for a license fee under the Agreement.

The Court agrees with Sanyo's argument in so much as the lack of a Product Agreement relates to a party's "Preferred Supplier/Exclusive Status" under § 5 of the DSA, specifically §§ 5.1 and 5.2, from which the statements quoted by Sanyo are excerpted. As discussed above with respect to Nartron's motion, § 5.1 requires designating a party a "Preferred Supplier" for a Product Agreement incorporated into a Parties' System. Here there was no Product Agreement for the CUE, and thus, no "Product Agreement" was incorporated "into an Original Equipment Manufacturer component, sub-system or system to be sold by the Parties to an Original Equipment Manufacturer ('Parties System')." Hence, § 5.1's specific condition for Preferred Supplier status is not met.

15

Similarly, § 5.2 provides terms "in the event that one of the Parties is unable to deliver acceptable Products on-time to meet the Parties reasonable lead times (quoted lead times) or poor quality."  The terms include assisting each other to identify an alternate supplier and licensing "to the other Party all industrial and intellectual property owned by the Party that is necessary for the Party to make or have made such Product(s)"—at "10% of the 'Lead Parties System' sale price to a customer of the 'Parties System' or any variants made" (Dkt 167-1 at PageID.1991).  The conclusion that §§ 5.1 and 5.2 are expressly linked to a Product Agreement, however, does not resolve the parties' overall dispute such that Sanyo is entitled to summary judgment.

It is undisputed that the parties proceeded with the joint development of products purportedly pursuant to the DSA, resulting in Sanyo's purchase of the alpha prototype from Nartron.  It is also undisputed that Sanyo subsequently developed the CUE system sold to GM.  The parties dispute whether the CUE system resulted from or involved "know-how" derived from Nartron, and whether Sanyo owes Nartron any remuneration.  Neither the DSA nor the record before the Court clearly resolves these disputes in favor of Sanyo.

First, with regard to the DSA, the language is ambiguous concerning whether a Product Agreement is a prerequisite to any and all recovery by Nartron.  Sanyo argues that "[t]here can be no Product without a Product Agreement, there can be no license fee without a Parties System, and there can be no Parties System without a Product Agreement" (Dkt 165 at PageID.1970; footnote omitted).  However, § 4 of the DSA appears to acknowledge just such a circumstance in its final sentence:  "Parties shall hold all ownership and licensing rights *to all Products developed or produced under this Agreement if they are not incorporated into, or made the subject of, a Product Agreement*, unless otherwise agreed, in writing, between Nartron and Sanyo" (Dkt 167-1 at PageID.

1991; emphasis added). On the other hand, by definition, "Products" means "Products individually identified *in Product Agreements* that shall define the scope, business objectives and responsibilities of the Parties" (Dkt 167-1 at PageID.1989). This ambiguity raises a question for the trier of fact to resolve, not the Court.

Likewise, whether Nartron's know-how is incorporated into the CUE system involves disputed issues of fact not properly resolved by the Court on summary judgment. Nartron asserts that for over a year and a half, it worked closely with Sanyo to build prototypes and teach Sanyo capacitive sensing technology, and it was only after Sanyo was awarded the GM contract that Sanyo sought suppliers that were cheaper than Nartron. However, Sanyo contends that Nartron's technology is not in the CUE, nor was it necessary to make the CUE. Both parties cite to record evidence in support of their opposing positions (*see, e.g.*, Dkt 164 at PageID.1948-1950; Dkt 165 at PageID.1973-1975). These issues of disputed fact preclude judgment as a matter of law.

Having fully considered the parties' arguments in light of the DSA, the Court concludes that Sanyo's cross-motion for summary judgment is properly denied as to the breach of contract claim.[8]

### B. Unjust Enrichment

Nartron argues that even if the Court finds no agreement exists between the parties, or that the agreement does not cover the service Nartron provided, Nartron may recover on a theory of unjust enrichment. Sanyo disagrees, asserting that there was no unjust enrichment as a matter of law

---

[8]The parties raise a number of additional arguments, or variations on their arguments in support of their respective motions, particularly in their Reply and Surreply. These arguments only further bear out that numerous disputed issues and evidence render summary judgment of the breach of contract claim inappropriate.

because there is an express contract that governs the same subject matter. The Court finds no basis for Nartron to recover on a theory of unjust enrichment on the record presented.

It is clear that the parties' entered into a contract governing their business relationship and joint development activities, as evidenced by the lengthy "Whereas" clauses set out in the beginning of the DSA. The scope of the DSA includes either party's or their joint, "engineering projects to develop products directed at Original Equipment Manufacturer customers of Parties ('Products')" (Dkt 167-1 at PageID.1988). The extent of Nartron's role and resources is broadly stated:

> Whereas, Nartron:
>
> - Has resources and experience in designing, developing and manufacturing innovative products including components, sub-systems and systems employing electronic and electro mechanical technologies for Original Equipment Manufacturer applications (hereafter "Nartron Products["]);
>
> - Products relating to design and/or development included but not limited to the following:
>
>   - Non-contact solid state sensing and control
>   - Smart Touch® Center Stack
>   - Electronic control modules
>
> - Wishes to manufacture for Sanyo Products or components and subsystems developed in the pursuit of the Products.
>
> - Wishes to have Sanyo manufacture components or sub-systems as a contract manufacturer.

(*Id.*). Nartron presents no credible evidence that the product development at issue falls outside the expressed scope of the DSA.

Under Michigan law, where there is an express contract with the defendant covering the subject matter of the claim, the plaintiff may not recover under a theory of unjust enrichment. *See Llewellyn-Jones v. Metro Property Group, LLC*, 22 F. Supp. 3d 760, 793-94 (E.D. Mich. 2014);

*Morris Pumps v. Centerline Piping, Inc.*, 729 N.W.2d 898, 903 (Mich. Ct. App. 2006); *Belle Isle Grill Corp. v. Detroit*, 666 N.W.2d 271, 280 (Mich. Ct. App. 2003). "A claim for unjust enrichment cannot be asserted when both parties agree that a contract exists, but dispute its terms." *Kussy v. Home Depot U.S.A. Inc.*, No. 06-12899, 2006 WL 3447146, at *4 (E.D. Mich. Nov. 28, 2006); *see also Llewellyn-Jones*, 22 F. Supp. 3d at 794. Sanyo is entitled to summary judgment of the unjust enrichment claim.

## V. Conclusion

The contract at issue in this case—the DSA—is far from a model of clarity. The difficult task of sorting through the various terms and provisions is only made even more complicated by the parties' course of dealing, which appears to have proceeded under the Agreement and then wholly ignored the key provisions. Much remains to be resolved in this case, including properly framing the legal questions and the associated factual issues, before the ultimate issue of a breach of contract can be determined. The parties' cross-motions and opposing, globally-focused summary judgment arguments have been of little assistance in this endeavor.

On the record and arguments presented, the Court concludes that Nartron's motion for summary judgment is properly denied, and Sanyo's cross-motion for summary judgment is properly denied as to the breach of contract claim, but granted as to the unjust enrichment claim.

An Order will enter consistent with this Opinion.


Dated: August 9, 2016          /s/ Janet T. Neff
                               JANET T. NEFF
                               United States District Judge