UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

---

OLDNAR CORPORATION
f/k/a Nartron Corporation,
a/k/a Gen X Microsystems, Inc.,

       Plaintiff,

v.

SANYO NORTH AMERICA
CORPORATION, a Delaware corporation, and
PANASONIC CORPORATION OF NORTH
AMERICA d/b/a PANASONIC
AUTOMOTIVE SYSTEMS COMPANY OF
AMERICA, a Delaware corporation,

       Defendants.

Case No. 1:13-cv-1064

Hon Janet T. Neff

---

## **DEFENDANTS' TRIAL BRIEF**

## INTRODUCTION

The proofs at trial will show that, at base, this is an automotive supply case in which Atmel, a supplier of capacitive technology, provided a touchscreen product to Sanyo North America ("SNA") (a subsidiary of Sanyo Electric Co. Ltd. ("Sanyo Japan")) that was superior to Nartron's. For this reason, the capacitive touchscreen center console (the "CUE") that was incorporated into certain General Motors ("GM") vehicles in 2011 by Sanyo Japan was based on a prototype built by Atmel and contained *none* of Nartron's capacitive touchscreen technology or "know-how." The touchscreen prototype that SNA purchased from Nartron in 2009 for $55,000 was ultimately found to have nothing that Sanyo Japan could use or wanted to use as it attempted to demonstrate to GM that it could provide a production-capable design for the CUE that complied with GM's specifications.  This is because Nartron was never able to demonstrate that the "proof of concept" technology reflected in its prototype could either meet GM specifications, or be made production capable at an acceptable cost.  For this reason no Product Agreement was ever executed by the parties.  As such, no licensing fees are due under the Development and Supply Agreement ("DSA").

In any event, the "know-how" Nartron claims was misappropriated is not legally-cognizable, compensable "know-how."  "Know-how" may only be the subject of a royalty-producing license agreement if it is secret, and if that secret information is disclosed in such a manner that the licensee can duplicate that "know-how."  Nartron's alleged "know-how" does not meet these basic legal requirements.  The capacitive technology utilized by Nartron in its prototype was common place in the industry and had been used for years by other suppliers in the capacitive technology field, including Atmel.  Further, Nartron never disclosed how it made its technology

work, as it kept secret the source codes to its software dependent technology.  Thus, Nartron never shared how to duplicate its alleged "know-how."

At trial, Panasonic Corporation of North America ("PNA") (successor to SNA by merger in 2015) will demonstrate that Nartron's claims are both legally and factually deficient.  The evidence will show that there was no breach of the parties' DSA and no unjust benefit conferred on Defendants.

### STATEMENT OF FACTS

SNA was a subsidiary of Sanyo Japan. Sanyo Japan was a longtime Tier 1 supplier of automotive parts to GM, including supplying it with the electronic bank for the center consoles of its vehicles. SNA supported Sanyo Japan in dealings with U.S. original equipment manufacturers. ("OEM's").  In 2007, SNA and Sanyo Japan approached GM about replacing the existing resistive touchscreen and button technology center consoles it was supplying to GM, which used electrical sensors to respond to tactile pressure, with capacitive touchscreens that required no tactile pressure. The proposal was to take capacitive touch technology that was ubiquitous in the consumer products arena, in such products as cell phones, appliances, ATM machines and similar products, and put it in a screen in the dash.  At that time, there were multiple major international suppliers of capacitive touchscreen technology, including Analog Devices, Cypress Technologies, Atmel, Quantum, Rohm and Alps.  SNA and Sanyo Japan engaged several of these suppliers, along with Nartron, a company located in Reed City, Michigan, to work with its own engineers (who had already designed, developed and manufactured non-automotive products containing capacitive technology) to posit solutions for the design and development of a capacitive touchscreen that could be integrated into Sanyo Japan's existing GM center console chassis.

During this initial investigation phase, Nartron and SNA executed the DSA.  The DSA was non-exclusive and unrelated to any specific product, technology or customer.  By its terms, the DSA expired in four (4) years unless extended by a Product Agreement. There was no Product Agreement here.

Ultimately, SNA and Sanyo Japan chose three touchscreen suppliers to develop prototypes to be demonstrated to GM: Analog Devices, Nartron and Atmel. SNA paid Nartron $55,000 for its prototype, which utilized a discrete component configuration ("circuit board") that was about the size of a half inch thick 5x8 index card to make the touchscreen function.  While fine for a "proof of concept" prototype, this configuration was unworkable for a production unit for many reasons, including the limited confines of an automotive center console.  To make its prototype production-capable, Nartron needed to reduce its circuit board to an Application Specific Integrated Circuit ("ASIC").  The ASIC would reduce the 5x8 index card to the size of two (2) postage stamps.  Analog, Cypress and Atmel had developed this type of integrated circuit ("IC") for capacitive touch technology, but Nartron had not. Nartron told SNA it would take up to eighteen (18) months to do so.  This was simply too long given the aggressive timeline that GM established for presentation of a production-ready capacitive touchscreen.

In addition, there were operational functions of Nartron's prototype that did not work reliably, and it was too costly to produce.  Among the operational functions out of compliance with GM specifications were: (1) failure to meet parasitic current requirement; (2) touch detection problems; (3) two-point touch caused ghosting; and (4) Nartron's open circuit design was susceptible to noise and false activations.   As for the economics, Nartron quoted a piece-price of over $13.00 for this non-compliant prototype that required a not-yet-developed ASIC to be functional.  For its production-capable technology, Atmel quoted a piece-price of $8.15.

3

By November 2009, SNA and Sanyo Japan agreed that Atmel's capacitive touchscreen was production-capable, technologically superior and more cost-competitive than the other suppliers, including Nartron. Atmel was selected to supply SNA's touchscreens, utilizing Atmel's already manufactured and widely used ASIC for the touchscreen and button bank. After a year and a half of design and development focused around Atmel's capacitive solution, in April 2011 GM issued a Production Purchase Order to Sanyo Japan for the specification compliant, production-capable center console with an integrated capacitive touchscreen, provided by Atmel.

Nearly four (4) years after Sanyo Japan selected Atmel as its touchscreen supplier, Nartron filed the instant lawsuit. Nartron's claims and causes of action have gone through several variations since filing suit in September 2013. Presently, Nartron claims that: (1) Defendants breached the DSA by using Nartron's "know-how" without paying Nartron a licensing fee or royalty; and (2) PNA was unjustly enriched because SNA utilized Nartron's "know-how" without paying a licensing fee, and PNA purchased SNA. Nartron claims under both theories that it is entitled to 10% of gross revenues related to the CUE for at least ten (10) years.

Nartron's claims and the damages theories have no factual or legal merit.

## LEGAL ANALYSIS

### I.    STANDARDS OF CONTRACT INTERPRETATION

As is discussed throughout this brief, interpretation of the DSA is central to this dispute. "The cardinal rule in the interpretation of contracts is to ascertain the intention of the parties. To this rule all others are subordinate." *Shay v. Aldrich*, 790 N.W.2d 629, 637 (Mich. 2010) (citation omitted). The best evidence of the parties' intent is the contract itself. *United Rentals (North America), Inc. v. Keizer*, 202 F. Supp. 2d 727 (W.D. Mich. 2002), *judgment aff'd*, 355 F.3d 399 (6th Cir. 2004) (applying Michigan law). The intention of the parties, as expressed in their

contracts, is to govern in the construction of the contracts. *Central Jersey Dodge Truck Center, Inc. v. Sightseer Corp.*, 608 F.2d 1106 (6th Cir. 1979); *Associated Truck Lines, Inc. v. Baer*, 346 Mich. 106 (1956); *Remes v. City of Holland*, 147 Mich. App. 550 (1985).  Accordingly, when a written contract is unambiguous, "[e]xtrinsic evidence cannot be summoned to aid interpretation." *Stryker Corp. v. Natl. Union Fire Ins. Co. of Pittsburgh, PA*, 842 F.3d 422, 426 (6th Cir. 2016), reh'g denied (Dec. 13, 2016) (citing *Shay*, 487 Mich. 648; Restatement (Second) of Contracts § 213 (1981); James B. Thayer, The "Parol Evidence" Rule, 6 Harv. L. Rev. 417, 418 (1893) ("[Y]ou cannot, in construing a written contract, deed, will, or other like writing, use the direct extrinsic expressions of the writer's meaning evidentially.")).

The initial question for the Court is thus whether the DSA is ambiguous.  Whether a contract is ambiguous is a question of law.  *See NILAC Intern. Marketing Group v. Ameritech Services, Inc.*, 362 F.3d 354, 2004 FED App. 0092P (6th Cir. 2004) (applying Michigan law). Only when contractual language is deemed ambiguous does the meaning of the contract become a question of fact. *RBS Citizens Bank, N.A. v. Purther*, 22 F. Supp. 3d 747 (E.D. Mich. 2014).  Courts cite a variety of principles of Michigan contract law when conducting this analysis, such as the following:

- Contractual terms are ambiguous only if they cannot possibly be read together in harmony. *Haring Charter Twp. v. Cadillac,* 290 Mich. App. 728, 2010 WL 3985034 (2010), appeal granted, 489 Mich. 858, 795 N.W.2d 17 (2011) and judgment aff'd, 807 N.W.2d 163 (Mich. 2012).

- In resolving whether a contract is ambiguous, a court must construe a contract according to its plain and ordinary meaning, and technical or constrained constructions are to be avoided. *Sivak v. United Parcel Service Co.,* 28 F. Supp. 3d 701 (E.D. Mich. 2014).

- Undefined terms within contract are accorded their common meaning. *Collins v. National General Ins. Co*., 834 F. Supp. 2d 632 (E.D. Mich. 2011).  Courts may rely on dictionary definitions to find the meaning of terms used in a contract. *Id.*

- On the other hand, parties to a contract are free to define words in a contract for the purposes of the contract; just because a party has defined a commonly understood phrase narrowly for the purposes of a contract, does not then make that phrase "ambiguous" globally. *Liberty Mut. Fire Ins. Co. v. Holka*, 984 F. Supp. 2d 688 (E.D. Mich. 2013).

- Only after a contract has been found to be ambiguous may a trial court consider extrinsic evidence. *Klapp,* 468 Mich. 459, 470-471 (2003).  "[C]onsidering extrinsic evidence in the absence of ambiguous language is 'clearly inconsistent with well-established principles of legal interpretation....' " *Blackhawk Dev. Corp. v. Village of Dexter*, 473 Mich. 33, 49 (2005) (quoting *Little v. Kin*, 468 Mich. 699, 700 n. 2 (2003)).

- Parties shall not "[seek] to fill a gap that does not exist, and contradict[] the fundamental principle that "[p]arol evidence under the guise of a claimed latent ambiguity is not permissible to vary, add to, or contradict" any other "plainly expressed terms of [the] writing." *Stryker Corp. v. Natl. Union Fire Ins. Co. of Pittsburgh, PA*, 842 F.3d 422, 428 (6th Cir. 2016), reh'g denied (Dec. 13, 2016) (citation omitted).

- Courts may not write a different contract for the parties.  *Antonoff v. Basso*, 347 Mich. 18 (1956); *Wausau Underwriters Ins. Co. v. Ajax Paving Industries, Inc*., 256 Mich. App. 646 (2003). The judiciary is without authority to modify unambiguous contracts or rebalance the contractual equities struck by the contracting parties because fundamental principles of contract law preclude such subjective post hoc judicial determinations of reasonableness as a basis upon which courts may refuse to enforce unambiguous contractual provisions. *Rory v. Continental Ins. Co.,* 473 Mich. 457 (2005); *Royal Property Group, LLC v. Prime Ins. Syndicate, Inc*., 267 Mich. App. 708 (2005).

With these principles in mind, Defendants turn to Nartron's arguments regarding the DSA.

## II.   NARTRON'S CLAIM TO A LICENSING FEE FAILS AS A MATTER OF LAW.

### A.   Nartron is not entitled to a licensing fee under §§ 5.1 and 5.2.

In August 2016, this Court held, as a matter of law, that Nartron cannot recover a licensing fee under §§ 5.1 or 5.2 of the DSA because Nartron and SNA never executed a Product Agreement. (ECF No. 177, PgID.2605.)  Since that ruling, Nartron has reconstituted its contract claim to find provisions other than §§ 5.1 or 5.2 of the DSA that it can claim Sanyo breached.  But by their express terms, none of the new provisions relied upon by Nartron provide a contract right to

recover licensing fees, let alone the 10% "royalty" Nartron demands.  Instead, these provisions merely make clear that the DSA leaves unaffected and thus preserved rights which the parties possessed outside of the DSA.

### B.    Section 4 does not specify a licensing fee must be paid to either party.

The primary "new" section of the DSA relied upon by Nartron to support its contract claim is § 4.  In pertinent part, § 4 of the DSA provides that the "Parties will have, *in addition* to any rights arising under this Agreement, the right to sell to any customer, Products developed under any Product Agreement…."  This alternative right of direct sale under section 4 is available *only* when a dispute arises between the parties over the marketing or sale of "*Products developed under any Product Agreement*." (*Id.*; emphasis added.)  Thus, Section 4 is inapplicable in this case for the same reason §§ 5.1 and 5.2 of the DSA are inapplicable: Nartron and SNA never executed a Product Agreement.  Also, it is undisputed that no one ever invoked the additional rights of direct sale under § 4.

Section 4 goes on to state the axiomatic point, made several times in the DSA, that the parties retain their respective rights in intellectual property that is not ultimately made subject to a Product Agreement.  Specifically, § 4 states that the parties "hold all ownership and licensing rights to all Products developed or produced under this Agreement if they are not incorporated into, or made the subject of, a Product Agreement."[1]  This simply means that if a direct sale scenario arises (which it never did), the parties can enforce in that scenario their *independent,*

---

[1] Section 4 creates no ambiguity as to the term "Product" under the DSA.  The alternative rights under section 4—if triggered—exist "…*in addition* to any rights arising under this Agreement…." (Emphasis added.)  As such, section 4 does not conflict with, but supplements the rights of the parties in a specific hypothetical scenario.  Simply put, even if section 4 does provide a broader definition of the term "Product" than the DSA's general terms (*see* §§ 1.8 and 5.1), that expanded definition applies *only* to the direct sale scenario contemplated by section 4, which never occurred.

***extra-contractual*** ownership and licensing rights in any technology that has not become the subject of a Product Agreement.  Such independent ownership/licensing rights are, by the very language of the DSA, not created by the DSA, are not subject to its terms, and are thus not at play in this action. As such, § 4 does not provide Nartron with a viable avenue for a breach claim or the recovery of contractual damages against PNA.

### C. No other section of the DSA states a licensing fee must be paid.

Nartron also appears to be claiming that §§ 8.1, 9.1 and 9.3 of the DSA provide it with the right to recover a licensing fee from PNA.  They do not.  These sections each state essentially the same axiomatic point made in § 4; that any rights in technology and/or trade secrets that exist ***outside the DSA***, and are not made subject to its terms through execution of a Product Agreement, are retained by the respective parties.  Specifically:

- Section 8.1 provides: "Trade secrets, non-patentable inventions and other confidential information in existence prior to the date of this Agreement shall remain the property of the disclosing party."

- Section 9.1 provides, in pertinent part: "***Existing Property Rights*** disclosed by one Party to the other Party for the purpose ***of conducting a Product Agreement*** will remain the property of the disclosing Party." (Emphasis added.)

- Section 9.3 provides, in pertinent part: "Except as specifically authorized in this DSA, neither Party may use ***Existing Property Rights***…belonging to the other Party without the prior written consent of the other Party in a separate license agreement and the payment of any royalty or other fees set forth in that license agreement ***as identified in the Product Agreement***." (Emphasis added.)

First, it must be noted that §§ 9.1 and 9.3 are not applicable in this case because, by their terms, their applicability dependents upon the existence of a Product Agreement.  Second, and more fundamentally, like § 4, each of these provisions addresses ownership and licensing rights that exist ***outside*** the DSA.  Indeed, "Existing Property Rights"—the express subject matter of §§ 9.1

and 9.3—is defined in § 1.11 as "intellectual property rights of each party which was created **outside the scope of this DSA** and Product Agreement." (Emphasis added.)

In sum, these provisions of the DSA only now relied upon by Nartron stand only for the unremarkable proposition that to the extent the parties have ownership and licensing rights in technology, "know-how" and/or trade secrets that existed before (§ 8.1) or exist outside (§§ 4, 8.1, 9.1 and 9.3) the DSA, those extra-contractual rights are not governed or circumscribed by the terms of the DSA.  A claim for breach of the DSA cannot be founded upon rights that arise and exist outside of the DSA and are expressly exempt from its terms.  Yet, that is precisely what Nartron is attempting to do.  In the wake of this Court's holding that §§ 5.1 and 5.2 of the DSA are inapplicable, Nartron now rests its breach of contract claim on §§ 4, 8.1, 9.1 and 9.3 of the DSA. For the reasons stated above, Nartron's claim for contractual licensing fees under these provisions must fail as a matter of law.

## III.    NARTRON CANNOT DEMONSTRATE ENTITLEMENT TO A LICENSING FEE.

### A.    Defendants paid for everything they received from Nartron.

Nartron claims that it provided Defendants with "know-how" embodied in its "proof of concept" prototype that Defendants failed to pay for.  This is not true.  Defendants paid Nartron $55,000 for its prototype and any "know-how" it incorporated.  Nartron cannot now be heard to complain that it sold Defendants the prototype for less than it was worth.

### B.    Nartron does not have the right to a licensing fee for claimed "know-how" that was actually publicly available information.

Both Nartron's contract and unjust enrichment claims center on Nartron's allegation that Defendants misappropriated its "know-how."  Yet, Nartron has not alleged that the "misappropriated know-how" was a trade secret, or even secret at all for that matter, and for good

reason – the bits of information Nartron claims constitutes its "know-how" have been readily available and known in the industry since before the DSA was entered.

"Federal law requires that all ideas in general circulation be dedicated to the common good unless they are protected by a valid patent." *Lear, Inc. v. Adkins,* 395 U.S. 653 (1969).  The right to a licensing fee or royalty is a ***property*** right.  Information that is not secret – i.e., that is in general circulation – is not "property" that may give rise to the right to licensing fees, absent a patent. As one court explained:

> [A] party may not license and collect royalty on technical information or a process or the like, unless it constitutes a discovery by the licensor which has been withheld from the public domain.  It does not have to be, these cases made clear, a patentable invention, but it must have the requisites we have just set out. It would therefore appear to matter not whether we construe this Agreement as having this effect, or whether we construe it as Hooker advocates we should construe it and then hold that the Agreement in this respect is void as against public policy.

*Hooker Chem. Corp. v. Velsicol Chem. Corp.*, 235 F. Supp. 412, 425 (W.D. Tenn. 1964)*; see also A & E Plastik Pak Co. v. Monsanto Co.,* 396 F.2d 710, 715 (9th Cir. 1968) ("Know-how, unlike a patent, confers upon the one who enjoys it no universal power to exclude others and its value is gone when the technology it encompasses is gained by the experience of others.").

Nartron admits that this case involves no claim of patent infringement.  Nartron's claimed right to recover licensing fees (the only type of damages it is seeking in this case) ***must*** therefore be based on the assertion that the "know-how" it provided to SNA was secret and unknown outside the confines of Nartron itself.  The proofs at trial will show conclusively that this is not true.  To the contrary, the alleged self-capacitive "know how" brought to the table by Nartron was common

knowledge and widely available in the industry long before 2008.[2]  PNA will prove at trial that SNA could have and did secure the precise information regarding capacitive technology supplied by Nartron from a variety of other suppliers in the market.

Because of the publicly-known nature of the "know-how" provided, which will be proven at trial, Nartron may not recover licensing fees under the DSA or any other theory of recovery.[3]

### C.    The proofs at trial will show that none of Nartron's "know-how" was incorporated into the CUE.

Nartron's claim that the CUE contains its technology and/or was created using its "know-how" has no foundation.  The proofs at trial will show that Nartron's technology never advanced beyond the "proof of concept" stage, and thus ***could not*** have been used in production.  This is because Nartron was never able reduce the half inch thick 5x8 index card size Circuit Board in its prototype to an ASIC.  Failure to do so compromised the quality, cost and ability to package the technology in the limited confines of a vehicle's center console.  In short, it was not an acceptable

---

[2] The evidence presented at trial will show that the ***only*** aspect of the Nartron prototype that could potentially be considered "secret" was the software containing the algorithms and source codes that made its capacitive technology operational.  Yet, Nartron will admit at trial that it refused to share those algorithms and source codes with SNA or anyone else.  Thus, the only possible "secret" encompassed by the Nartron prototype ***remained*** secret.  No viable claim for licensing fees under the DSA can arise from Nartron supplying SNA with publicly available "know how" for a prototype that cannot be made to work.

[3] Nartron has recently signaled that it may attempt to side-step the fact that its "know how" was ***not*** secret—and thus not compensable—by manufacturing a claim under the parties' Confidentiality Agreement.  Under this new theory, Nartron appears prepared to assert that SNA breached the Confidentiality Agreement by using "know how" that was allegedly subject to that agreement.  But Nartron has never pleaded a claim under the Confidentiality Agreement.  Also, a party cannot make something "secret," and recover damages for its disclosure, merely by making it the subject of a confidentiality agreement.  *See Rockwell Med., Inc. v. Yocum*, 76 F. Supp. 3d 636, 647 (E.D. Mich. 2014), aff'd, 630 Fed. App'x 499 (6th Cir. 2015) (unpublished) ("The fact that the confidentiality agreement purports to extend to 'any information' that the Company deems 'confidential,' at its whim, is not sufficient to establish that 'disclosure' of that information not actually kept secret was a breach of that agreement."); *Follmer, Rudzewicz & Co. v. Kosco*, 420 Mich. 394 (1984) (refusing to enforce a clause that would make a contracting party pay damages "for using information labeled confidential which is not in fact confidential.").

solution.  In contrast, other suppliers, including Atmel and Cypress, **had** provided prototypes that demonstrated production-capable technology utilizing already manufactured ASIC chip technology that Nartron, by its own admission, did not possess.  To this point, the proofs will show the capacitive technology in the CUE is Atmel's.  It utilizes Atmel's ASIC chip and is based upon Atmel's design interface between the sensors in the touchscreen and the software designed by SNA and Sanyo Japan to produce the final product. [4]

Second, the proofs will show that the capacitive technology in the CUE is of a different type than the technology utilized in Nartron's prototype.  The CUE utilized what was at the time state-of-the-art "mutual capacitive" technology as provided by Atmel, while Nartron's prototype utilized a rudimentary "self-capacitive" technology that had been ubiquitous in the capacitive industry for decades.  Yet, Nartron will claim that because both systems utilize some form of capacitive technology and have certain pedestrian features in common, the technology in the CUE must have its origins in the "know how" reflected in its prototype.  This is akin to arguing that a pear must derive from an apple because they are both fruit.

Third, Nartron will be unable to explain how and why Defendants would want to use Nartron's alleged "know-how" in the CUE.  ***How*** would Defendants use "know-how" where they

---

[4] Nartron was well aware of the distinct possibility that it might not be chosen as the capacitive technology supplier for the CUE, and that it did not believe it would receive licensing fees under the DSA if Defendants chose a supplier ***other*** than Nartron. The evidence will show that when analyzing the potential licensing fees generated under the DSA from production of the CUE, Nartron looked exclusively to a scenario in which ***its*** capacitive technology was used.  Nartron made no claim to a royalty on revenues flowing from production of the CUE if Defendants selected Atmel—or any supplier other than Nartron—as the capacitive technology supplier. The reason for the absence of such a contemporaneous claim is simple:  Nartron ***knew*** it was competing with other suppliers for the CUE business, and knew that if it wasn't selected, it would receive no licensing fees under the DSA.

didn't have access to its brain—its software source codes.  *Why* would Defendants use Nartron's "know-how" on a GM product after Defendants found Nartron was a blacklisted supplier at GM.

In the end, Nartron's right to a licensing fee here will turn on applying the DSA as written and whether Nartron is correct that all capacitive technology has its origin in Nartron.  To this point the evidence will show that Nartron is not entitled to a licensing fee because: (1) there was no Product Agreement; (2) Nartron shared nothing with Defendants that was secret and for which it was not paid; and/or (3) Atmel's technology and design went into the CUE.

## IV.   NARTRON'S UNJUST ENRICHMENT CLAIM FAILS AS A MATTER OF LAW.

### A.   Nartron's unjust enrichment claim is barred by the Michigan Uniform Trade Secrets Act.

In addition to being barred by the DSA, Nartron's unjust enrichment claim is preempted by the Michigan Uniform Trade Secrets Act ("MUTSA").  MUTSA provides statutory remedies for the misappropriation of trade secrets. MCL §§ 445.1903, 1904.  The statute also displaces conflicting common law remedies for misappropriation of a trade secret. Specifically, MUTSA provides that the "act displaces conflicting tort, restitutionary, and other law of this state providing civil remedies for misappropriation of a trade secret." MCL § 445.1908(a).  Common law claims are displaced when the operative facts of those claims are arguably cognizable as claims governed by the Uniform Trade Secrets Act ("UTSA"). *Bliss Clearing Niagara, Inc. v. Midwest Brake Bond Co.*, 270 F. Supp. 2d 943, 948–49 (W.D. Mich. 2003) (dismissing common law claims as preempted by MUTSA despite the disputed status of information as trade secret); *see also Glasstech, Inc. v. TGL Tempering Sys., Inc.*, 50 F. Supp. 2d 722, 730-31 (N.D. Ohio 1999) (unjust enrichment claim displaced by Ohio's UTSA where plaintiff alleged defendants benefitted from having access to and using plaintiff's proprietary technology and trade secrets); *Wysong Corp. v. M.I. Indus.*, 412 F. Supp. 2d 612 (E.D. Mich. 2005) (MUTSA displaced plaintiff's unjust

13

enrichment claim to the extent that the claim alleged enrichment from misappropriation of a trade secret).

In *Stolle Machinery v. Ram Precision Indus.*, 605 Fed. App'x 473 (6th Cir. 2015), the Sixth Circuit examined the displacement language of the UTSA, and aligned itself with courts which have interpreted UTSA's preemption clause broadly to abolish all other causes of action for theft, misuse, or misappropriation of any confidential or secret information. *Id.* at 485.  Thus, under *Stolle Machinery* and other cases within this Circuit, Nartron's allegations of unjust enrichment are preempted by the MUTSA if they are even arguably cognizable as allegations of misappropriation of trade secrets. *See Midfield Concession Enterprises, Inc., v. Areas USA, Inc.*, 2014 WL 4211013, *3 (E.D. Mich. Aug. 24, 2014) (the displacement section of the MUTSA "eliminate[s] common law claims where the operative facts are arguably cognizable under MUTSA").  On the face of Nartron's operative Complaint, its unjust enrichment claims are clearly cognizable as trade secret claims under MUFTA.  Nartron asserts that PNA unjustly benefitted from having access to and using Nartron's proprietary technology and "know-how." (ECF No. 70, ¶¶ 57-59, PgID.991.)  Under Michigan law, Nartron's sole avenue of redress for such claims is MUTSA.  Accordingly, Nartron's unjust enrichment claim against PNA fails as a matter of law.

**B.  Nartron's unjust enrichment claim is barred because a contract exists between the parties covering the same subject matter.**

Unjust enrichment is equitable restitution imposed by quasi-contract "when a person has been unjustly enriched at the expense of another."  *Morris Pumps v. Centerline Piping Inc.*, 273 Mich. App. 187, 193 (2006).  Imposing a quasi-contract "is an activity which should be approached with some caution." *Dumas v. Auto Club Insurance Association*, 437 Mich. 521, 546 (1991).  In the present case, PNA is a party to the DSA, as it is the successor by merger to SNA, the original signatory to the DSA. *Dawson v. Rent-A-Ctr. Inc.,* 490 Fed. App'x 727, 730 (6th Cir. 2012) ("[I]n

a merger, the surviving corporation assumes all rights and liabilities of the disappearing corporation."). Nartron acknowledges this reality, and it is attempting to enforce the provisions of the DSA against PNA as a party to the agreement. (*See* ECF No. 70, Corrected Second Amended Complaint, ¶ 54, PgID.991, "In acquiring [SNA], [Panasonic] also acquired all rights and responsibilities of [SNA] including those arising under the [DSA].")  Under settled law, a quasi-contract may not be imposed where an actual contract exists covering the same subject matter.  *See Llewellyn-Jones v. Metro Property Group, LLC,* 22 F. Supp. 3d 760, 793-94 (E.D. Mich. 2014); *Belle Isle Grill Corp. v. Detroit,* 666 N.W.2d 271, 280 (Mich. Ct. App. 2003).  Nartron's unjust enrichment claim against PNA is a mirror image of breach of contract claim.  In substantive part, Nartron alleges in its unjust enrichment claim:

> 57.    [SNA] and [PNA] have received numerous benefits from Nartron including the use of Nartron's resources, experience and expertise in designing, developing and manufacturing products utilizing Nartron's Smart Touch Technology and other technology so that [SNA] and PASA could obtain supply agreements with Ford and GM.

> 58.    [SNA] and PASA have not compensated Nartron for these benefits.

> 59.    An inequity has resulted to Nartron because of [SNA] and PASA's retention of the benefits without compensation.

ECF No. 70, ¶¶ 57-59, PgID.991.)  This Court has already determined that the subject matter of this unjust enrichment claim falls within the expressed scope of the DSA.[5]  As such, Nartron's unjust enrichment claim must fail as a matter of law.

---

[5] Nartron's identical unjust enrichment claim against SNA has already been dismissed by this Court on the basis that the claim is barred because it is encompassed by the scope of the DSA.  (ECF No. 177, PgID.2608-09.)

## V.  NARTRON'S UNJUST ENRICHMENT HAS NO BASIS IN FACT.

As noted above, Nartron cannot recover licensing fees and/or royalties under a theory of unjust enrichment for the alleged unauthorized use of "secret" information or technology.  Such a claim lies exclusively within the purview of MUTSA.  Thus, the only potential avenue for recovery under a claim for unjust enrichment (assuming the claim is not preempted in its entirety by the DSA, which it is) would be if Nartron was not fairly compensated for the prototype itself.  The proofs at trial will show conclusively that Nartron *was* paid for the prototype, and was paid exactly what the parties agreed to.  Specifically, SNA paid Nartron $55,000 for the prototype which is precisely what they agreed to.  Thus, Nartron will not be able to carry its burden and state a viable cause of action for unjust enrichment at trial.  *See In re Auto. Parts Antitrust Litig.,* 2014 WL 2993753, at *25 (E.D. Mich. July 3, 2014) ("[Plaintiffs] voluntarily entered into purchasing arrangements…and received the benefit of their bargains. Therefore, all of the unjust enrichment claims must be dismissed.").

## VI.  EVEN IF DAMAGES ARE DEEMED TO BE RECOVERABLE, THEY ARE LIMITED TO THE YEARS 2008 THROUGH 2012.

Nartron will seek licensing fee damages under the DSA through *2018*.  The DSA is dated April 2, *2008*, and contains several terms regarding the duration of the contract, the longest being *4 years*. (DSA, §§ 5.1, 7.1, 7.2.)  To date, Nartron has come forward with no contractual justification for its demand for *10 years* of contractual licensing fee damages.  Nor will it be able to so at trial, as no such justification exists.  Even assuming Nartron is able to overcome at trial all of the legal and factual hurdles that stand in the way of the recovery of any damages whatsoever, under the express terms of the DSA, such damages may not extend beyond April, 2012.

## CONCLUSION

At trial, this Court will see that Nartron was given every opportunity to compete for and win the SNA capacitive touchscreen business.  Nartron lost that business because its conceptual technology remained only a concept that SNA and Sanyo Japan could not use, produce, or sell. The evidence will show unequivocally that Nartron could not compete for and win the capacitive touchscreen business at issue in this case, and that the technology it presented in its prototype was not secret, utilized or valuable beyond the $55,000 it was paid.

Respectfully submitted,

Dated:  March 9, 2017

/s/John E. Anding
John E. Anding (P30356)
LaRissa D. Hollingsworth (P62774)
Amanda P. Narvaes (P74957)
**DREW, COOPER & ANDING, P.C.**
Aldrich Place, Suite 200
80 Ottawa Avenue NW
Grand Rapids, MI 49503
(616) 454-8300

<u>**CERTIFICATE OF SERVICE**</u>

I certify that on March 9, 2017, the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

Dated:  March 9, 2017

/s/John E. Anding
John E. Anding (P30356)
LaRissa D. Hollingsworth (P62774)
Amanda P. Narvaes (P74957)
**DREW, COOPER & ANDING, P.C.**
Aldrich Place, Suite 200
80 Ottawa Avenue NW
Grand Rapids, MI 49503
(616) 454-8300

I:\JEATeam\3474-01\PLDG\Trial.Brief_2017.03.09_FINAL(120.135)