UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

---

OLDNAR CORPORATION
f/k/a Nartron Corporation,
a/k/a Gen X Microsystems, Inc.,

    Plaintiff,

v.

SANYO NORTH AMERICA
CORPORATION, a Delaware corporation, and
PANASONIC CORPORATION OF NORTH
AMERICA d/b/a PANASONIC
AUTOMOTIVE SYSTEMS COMPANY OF
AMERICA, a Delaware corporation,

    Defendants.

Case No. 1:13-cv-1064

Hon. Janet T. Neff

---

## DEFENDANTS' TRIAL BRIEF ON CONSTRUCTION OF THE DEVELOPMENT AND SUPPLY AGREEMENT

**TABLE OF CONTENTS**

PAGE

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ...............................................................................................................1

RELEVANT PROCEDURAL HISTORY ..........................................................................2

LEGAL STANDARDS .......................................................................................................3

    I.    THIS COURT MUST DETERMINE THAT THE CONTRACT IS AMBIGUOUS
        AS A MATTER OF LAW BEFORE HEARING ANY EXTRINSIC EVIDENCE ..........................3

    II.   STANDARDS APPLICABLE WHEN DETERMINING WHETHER A
        CONTRACT IS AMBIGUOUS ........................................................................4

    III.  STANDARDS APPLICABLE IN THE EVENT THE COURT CONSIDERS
        EXTRINSIC EVIDENCE TO RESOLVE A PERCEIVED AMBIGUITY ...................................5

RELEVANT FACTS ...........................................................................................................6

LEGAL ANALYSIS ............................................................................................................7

    I.    THE TERM "PRODUCTS" AS USED IN THE DSA IS NO LONGER RELEVANT
        TO THIS CASE; ANY AMBIGUITY REGARDING ITS DEFINITION NEED NOT
        BE RESOLVED BY THIS COURT ..................................................................7

    II.   NARTRON'S NEW ARGUMENT IS APPARENTLY THAT SANYO
        MISAPPROPRIATED "EXISTING PROPERTY RIGHTS" PURSUANT TO § 9.3....................8

    III.  SECTION 9.3 OF THE DSA IS A PRESERVATION PROVISION THAT
        DOES NOT CREATE A CONTRACTUAL RIGHT TO A LICENSING FEE
        FOR EXISTING PROPERTY RIGHTS BY DESIGN............................................9

    IV.  NARTRON REMAINED FREE TO PROTECT AND ENFORCE ITS RETAINED
        ALLEGED OWNERSHIP RIGHTS IN THE "KNOW HOW" AT ISSUE IN THIS CASE.
        IT CHOSE INSTEAD TO ATTEMPT TO ENFORCE NON-EXISTENT CONTRACTUAL
        RIGHTS UNDER THE DSA..........................................................................11

    V.   UNDER ITS UNAMBIGUOUS TERMS, THE DSA EXPIRED ON APRIL 2, 2012 ...............12

CONCLUSION..................................................................................................................13

# TABLE OF AUTHORITIES

**CASES**          **PAGE(S)**

*In re AmTrust Fin. Corp.*, 694 F.3d 741 (6th Cir. 2012) ...................................................................8

*Ardent Serv. Corp. v. Grand Beach Real Estate Inv., LLC,* No. 1:12-cv-583,
    2014 WL 6073319 (W.D. Mich. Nov. 13, 2014), *aff'd sub nom* .........................................8

*BP1, LLC v. Coventry Real Estate Fund II, LLC*, No. 312579,
    2014 WL 4723146 (Mich. Ct. App. Sept. 23, 2014) ........................................................4

*Bliss Clearing Niagara, Inc. v. Midwest Brake Bond Co.*,
    270 F. Supp. 2d 943 (W.D. Mich. 2003) ........................................................................12

*Burkhardt v. Bailey,* 260 Mich. App. 636 (2004) ............................................................5

*CMI-Trading, Inc., v. Quantum Air, Inc.*, 98 F.3d 887 (6th Cir. 1996) ...........................5

*Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*,
    511 F.3d 535 (6th Cir. 2007) ............................................................................................3

*Cleveland-Cliffs Iron Co. v. Chicago & N.W. Transportation Co.,*
    581 F. Supp. 1144 (W.D. Mich. 1984) .............................................................................4

*Clevenger v. Allstate Ins. Co.,* 443 Mich. 646 (1993) .....................................................4

*Coates v. Bastian Bros., Inc.,* 276 Mich. App. 498 (2007)...............................................3

*Cunningham v. Bienfang*, No. 3:00-cv-0448-L,
    2002 WL 31553976 (N.D. Tex. Nov. 15, 2002)...............................................................6

*Darcy v. CitiFinancial, Inc.,* No. 1:10-cv-848,
    2011 WL 3758805 (W.D. Mich. Aug. 25, 2011)..............................................................4

*Detroit Bank & Trust Co. v. Coopes,* 93 Mich. App. 459 (1979).......................................8

*Fragner v. Amer. Comm. Mut. Ins. Co.,* 199 Mich. App. 537 (1993) ..............................4

*Fresard v. Mich. Millers Mut. Ins. Co.,* 414 Mich. 686 (1982).........................................4

*Gaydos v. White Motor Corp.*, 54 Mich. App. 143 (1974)................................................5

*Giles v. Univ. of Toledo*, 478 F. Supp. 2d 942 (N.D. Ohio 2007),
    *aff'd*, 286 F. App'x 295 (6th Cir. 2008)............................................................................12

*Grubb & Ellis Co. v. Bradley Real Estate Trust,* 909 F.2d 1050 (7th Cir. 1990) ......................... 12

*KSR Int'l Co. v. Delphi Automotive System, LLC*, 523 Fed. App'x 357 (6th Cir. 2013) ............... 12

*Klapp v. United Ins. Grp. Agency, Inc.,* 468 Mich. 459 (2003) ................................................... 4, 5

*Michigan Chandelier Co. v. Morse,* 297 Mich. 41 (1941) ............................................................... 4

*Mut. Life Ins. Co. of N.Y. v. Hurni Packing Co.*, 263 U.S. 167 (1923) ......................................... 12

*In re Nartron Corp.*, 330 B.R. 573 (Bankr. W.D. Mich. 2005) ..................................................... 11

*N. Am. Specialty Ins. Co. v. Myers*, 111 F.3d 1273 (6th Cir. 1997) ................................................ 5

*Penzien v. Dielectric Products Engineering Co., Inc.,* 374 Mich. 444 (1965) ................................ 8

*Sault Ste. Marie Tribe of Chippewa Indians v. Engler,* 146 F.3d 367 (6th Cir. 1998) .................... 5

*Sault Ste. Marie Tribe of Chippewa Indians v. Granholm*, 475 F.3d 805 (6th Cir. 2007) .............. 5

*Schachner v. Blue Cross & Blue Shield of Ohio*, 77 F.3d 889 (6th Cir. 1996) ................................ 4

*SEC v. Goldsworthy*, No. 06-10012-JGD, 2008 WL 2943398 (D. Mass. Jan. 3, 2008) .............. 5, 6

*Soc'y of St. Vincent De Paul in Archdiocese of Detroit v. Mt. Hawley Ins. Co.*,
    49 F. Supp. 2d 1011 (E.D. Mich. 1999) ............................................................................... 3, 4

*Stryker Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*,
    842 F.3d 422 (6th Cir. 2016) ..................................................................................................... 5

*Talmer Bank & Trust v. Minton Firm, P.C.*, 660 F. App'x 439 (6th Cir. 2016) ............................. 8

*In re Tasch, Inc.*, No. 97-15901-JAB, 1999 WL 596261 (E.D. La. Aug. 5, 1999) ......................... 6

*Upjohn Co. v. New Hampshire Ins. Co.,* 438 Mich. 197 (1991) ...................................................... 4

*Wysong Corp. v. M.I. Indus.*, 412 F. Supp. 2d 612 (E.D. Mich. 2005) ......................................... 12

*Zurcher v. Herveat,* 238 Mich. App. 267 (1999) ............................................................................. 5

*Zurich Ins. Co. v. CCR & Co.*, 226 Mich. App. 599 (1997) ............................................................ 4

**INTRODUCTION**

The principle ambiguity over whether Nartron is entitled to a licensing fee for alleged "know how" has derived not from the language of the Development and Supply Agreement ("DSA"), but from Plaintiff Oldnar Corporation's ("Nartron") inability to settle upon precisely what provision(s) of the DSA supports this claim. This Court's Order bifurcating trial has forced Nartron to bring clarity to its claim. In Plaintiff's Contract Construction Brief, (ECF No. 323) Nartron asserts—for the first time—that its claim for licensing fees against Defendants hinges on § 9.3 of the DSA. Nartron also asserts that § 9.3 is unambiguous. On this point Nartron is correct. So are §§ 1.11, 1.12 and 9.1 of the DSA, which animate § 9.3.

Section 9.3, like numerous other provisions in the DSA, is a "carve out" or preservation clause. In unambiguous terms, § 9.3 states that the DSA does not authorize the use of Existing Property Rights belonging to the respective parties. These intellectual property rights are thus extra-contractual, fall *outside* the scope of the DSA and are not subject to its terms. Section 9.3 also explains how such rights may be identified and incorporated into the DSA—through notification to the other party and execution of a separate licensing agreement identified in a Product Agreement. As this Court has previously held, the parties never executed a Product Agreement related to the capacitive touch "know how" at issue. (ECF No. 177, PgID.2606-07.) Thus, by its terms § 9.3 is not implicated here, and any extra-contractual intellectual property rights—and any remedy for their misappropriation—lie *outside* the DSA.

Nartron asserts that if the operative provisions of the DSA are enforced as written, then "Defendants could unilaterally use Nartron's know-how and property rights—without permission, restriction, or payment—as long [sic] they chose *not* to sign a Product Agreement." (ECF No. 323, PgID.5041.) Not true. Indeed, if *any* company in the state of Michigan knows that a contract is

1

not the only vehicle for judicially asserting alleged rights in intellectual property, it is Nartron.[1] If Nartron believed that Defendants wrongfully used Nartron's Existing Property Rights, the DSA specifically preserved its ability to enforce such rights through extra-contractual means. It chose not to do so.

As discussed below, and as will be explained and demonstrated at trial, § 9.3 of the DSA is unambiguous and when read harmoniously with the balance of the DSA, provides no basis for Nartron's claimed contractual right to a licensing fee.

## RELEVANT PROCEDURAL HISTORY

At the close of discovery in this case, both parties brought motions for summary judgment. For its part, Nartron asserted that it was entitled to judgment as a matter of law on its breach of contract claim against Defendants under §§ 5.1 and 5.2 of the DSA. (ECF No. 163.) Nartron did not seek judgment under any other provisions of the DSA, including but not limited to § 9.3. Nor did it invoke § 9.3 in opposition to Defendants' motion for summary judgment. On August 9, 2016, this Court issued its Opinion on the parties' cross motions. In relevant part, the Court held

---

[1] *See e.g. Nartron Corp. v. Arvinmeritor, Inc.,* No. 2:03-cv-75186 (E.D. Mich. Dec. 29, 2003); *Nartron Corp. v. General Electric, et al.,* No. 2:03-cv-75169 (E.D. Mich. Dec. 24, 2003); *Nartron Corp. v. General Motors Corp.,* No. 245942 (Mich. App. Jan. 8, 2003); *Nartron Corp. v. General Motors Corp.*, No. 232085 (Mich. App. Jan. 17, 2001); *Nartron Corp. v. Pitney Bowes Inc.*, No. 2:96-cv-74689 (E.D. Mich. Oct. 10, 1996); *Nartron Corp. v. Scotsman Grp. Inc.*, No. 2:02-cv-72637 (E.D. Mich. June 25, 2002); *Nartron Corp. v. Stimicroelectronics*, No. 2:98-cv-75607 (E.D. Mich. Nov. 13, 1998); *Nartron Corp. v. Toyota Motor Sales, et al.*, No. 2:04-cv-70013 (E.D. Mich. Jan. 5, 2004); *Nartron Corp. v. VDO North America LLC*, No. 2:00-cv-71417 (E.D. Mich. Mar. 21, 2000); *Nartron Corp. v. Hourmand*, No. 1:10-cv-00691 (W.D. Mich. July 20, 2010); *Nartron Corp. v. Combustion Assoc. Inc., et al.*, No. 5:92-cv-00106 (W.D. Mich. Sept. 16, 1992); *Nartron Corp. v. EGO North America Inc., et al.*, No. 2:04-cv-74367 (E.D. Mich. Nov. 9, 2004); *Nartron Corp. v. ELO Touchsystems Inc.*, No. 2:06-cv-11075 (E.D. Mich. Mar. 14, 2006); *Nartron Corp. v. Hamilton/Avnet Electrical, et al.*, No. 5:90-cv-00060 (W.D. Mich. July 24, 1990); *Nartron Corp. v. Malco Mfg. Co. Inc.*, No. 1:99-cv-00234 (W.D. Mich. Mar. 25, 1999); *Nartron Corp. v. Quantum Research Grp. Ltd.*, No. 2:06-cv-13793 (E.D. Mich. Aug. 25, 2006); *Nartron Corp. v. Schukra USA, Inc., et al.*, No. 2:06-cv-10693 (E.D. Mich. Feb. 16, 2006); *Nartron Corp. v. Tuthill Corp.*, No. 2:05-cv-70323 (E.D. Mich. Jan. 28, 2005).

that §§ 5.1 and 5.2 were not applicable because of the absence of a Product Agreement. (ECF No. 177, PgID.2607-2608.)  The Court did not dismiss Nartron's breach of contract claim in its entirety, however, finding that a question of fact existed as to whether Nartron had the right to a licensing fee absent a Product Agreement. (*Id.*)  The Court went on to dismiss Nartron's unjust enrichment claim against Defendant SNA on the basis that it covered the same subject matter as the DSA. (ECF No. 177, PgID.2708-09.)

On March 24, 2017, Nartron submitted a "Contract Construction Brief" as required by this Court's Trial Preparation Order.  In that Order, the Court advised that the upcoming portion of the bifurcated trial will "address only the matters of contract construction, i.e., (1) whether the contract or specific provisions are ambiguous; and (2) if the contract is ambiguous, the interpretation of the contract."  In its brief, Nartron argues for the first time that § 9.3 authorizes recovery by Nartron of licensing fees from Defendants. (ECF No. 323.)  Defendants now submit the instant brief pursuant to the Trial Preparation Order.

Below are the legal standards that should be applied in this proceeding.

## **LEGAL STANDARDS**

**I.   THIS COURT MUST DETERMINE THAT THE CONTRACT IS AMBIGUOUS AS A MATTER OF LAW BEFORE HEARING ANY EXTRINSIC EVIDENCE.**

In Michigan, "[t]he proper interpretation of a contract is a question of law." *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 543–44 (6th Cir. 2007) (citing *Coates v. Bastian Bros., Inc.,* 276 Mich. App. 498 (2007)).  The following authority explains the well-settled proposition that the Court must determine that an ambiguity exists in the operative provisions of a contract before admitting extrinsic evidence:

- "If unambiguous, the court must enforce the contract as written, according to its plain meaning, without looking to extrinsic evidence." *Soc'y of St. Vincent De Paul in Archdiocese of Detroit v. Mt. Hawley Ins. Co.*, 49 F. Supp. 2d 1011, 1016 (E.D. Mich.

1999) (citing *Clevenger v. Allstate Ins. Co.,* 443 Mich. 646, 654, (1993) and *Upjohn Co. v. New Hampshire Ins. Co.,* 438 Mich. 197, 205 n. 6 (1991)).

- Before "a district court can consider extrinsic evidence of the parties' intent, it must find an ambiguity on the face of the contract." *Schachner v. Blue Cross & Blue Shield of Ohio*, 77 F.3d 889, 893 (6th Cir. 1996).

- "This court does not have the right to make a different contract for the parties or to look to extrinsic testimony to determine their intent when the words used by them are clear and unambiguous and have a definite meaning." *Michigan Chandelier Co. v. Morse,* 297 Mich. 41, 49 (1941).

- Where "the terms of a contract are unambiguous, their construction is for the court to determine as a matter of law, and the plain meaning of the terms may not be impeached with extrinsic evidence." *Zurich Ins. Co. v. CCR & Co.*, 226 Mich. App. 599, 603–05 (1997).

## II. STANDARDS APPLICABLE WHEN DETERMINING WHETHER A CONTRACT IS AMBIGUOUS.

The following authority sets forth applicable and instructive guidelines for determining whether an ambiguity exists in a contract.

- A contract which admits of but one interpretation is unambiguous. *Soc'y of St. Vincent De Paul in Archdiocese of Detroit,* 49 F. Supp. 2d at 1016 (citing *Fragner v. Amer. Comm. Mut. Ins. Co.,* 199 Mich. App. 537, 540 (1993)).

- "The presumption that the parties are bound by the language of the agreement they negotiated applies with even greater force when the parties are sophisticated entities that have engaged in arms-length negotiations." *BP1, LLC v. Coventry Real Estate Fund II, LLC*, No. 312579, 2014 WL 4723146, at *2 (Mich. Ct. App. Sept. 23, 2014).

- "If contract terms or clauses appear to conflict, the court must strive to harmonize them" before declaring the contract ambiguous. *Darcy v. CitiFinancial, Inc.,* No. 1:10-cv-848, 2011 WL 3758805, at *3 (W.D. Mich. Aug. 25, 2011); *Fresard v. Mich. Millers Mut. Ins. Co.,* 414 Mich. 686 (1982).

- In contrast, a contract is ambiguous when two or more relevant provisions "irreconcilably conflict with each other." *Klapp v. United Ins. Grp. Agency, Inc.,* 468 Mich. 459, 467 (2003).

- The "real issue is not whether the parties disagree on the meaning of terms to the contract, but whether the terms themselves are ambiguous. If the contract terms are not ambiguous, then contradictory inferences which may be drawn are subjective, and irrelevant." *Cleveland-Cliffs Iron Co. v. Chicago & N.W. Transportation Co.,* 581 F. Supp. 1144, 1149 (W.D. Mich. 1984) (citations omitted).

4

- One party's views on the intent behind a contract, harbored but unexpressed to the other party, is inadmissible extrinsic evidence for purposes of resolving an ambiguity in a contract. *Stryker Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 842 F.3d 422, 428 (6th Cir. 2016).

- The "unilateral subjective intent of one party cannot control the terms of a contract." *Burkhardt v. Bailey,* 260 Mich. App. 636, 656, (2004).

- "It is beyond doubt that the actual mental processes of the contracting parties are wholly irrelevant to the construction of contractual terms."  *Zurcher v. Herveat,* 238 Mich. App. 267, 299 (1999).

### III. STANDARDS APPLICABLE IN THE EVENT THE COURT CONSIDERS EXTRINSIC EVIDENCE TO RESOLVE A PERCEIVED AMBIGUITY.

The following authority sets forth applicable and instructive guidelines for the consideration of extrinsic evidence in the event the Court determines that such an ambiguity exists in the operative provisions of the DSA.

- "[E]ven where an ambiguity exists, extrinsic evidence must shed some light on the circumstances surrounding the contract formation in order to be admissible." *Sault Ste. Marie Tribe of Chippewa Indians v. Granholm*, 475 F.3d 805, 815–16 (6th Cir. 2007).

- "'[U]nless extrinsic evidence can speak to the intent of *all* parties to a contract, it provides an incomplete guide with which to interpret contractual language.'" *Klapp v. United Ins. Grp. Agency, Inc.,* 468 Mich. 459, 483 (2003) (citation omitted, emphasis in original).

- "Where parol [evidence] seeks to change the clear scope, effect, and obligation of the written contract, it should be rejected. A onesided, self-serving interpretation is of no assistance in interpretation." *Gaydos v. White Motor Corp.*, 54 Mich. App. 143, 149–50 (1974) (citations omitted).

- "Post-hoc interpretations . . . are irrelevant to the parties' intent at the time of the agreement*." Sault Ste. Marie Tribe of Chippewa Indians v. Engler,* 146 F.3d 367, 373–74 (6th Cir. 1998).

- "Absent any need to clarify or define terms of art, science, or trade, expert opinion testimony to interpret contract language is inadmissible." *N. Am. Specialty Ins. Co. v. Myers*, 111 F.3d 1273, 1281 (6th Cir. 1997); *see also CMI-Trading, Inc., v. Quantum Air, Inc.*, 98 F.3d 887, 890 (6th Cir. 1996) (barring a proffered expert from opining as to the parties' contractual intent because his opinion based on reviewing the documents at issue "will not assist the [trier of fact], within the meaning of Federal Rule of Evidence 702, in determining the factual issue of intent"); *see also SEC v. Goldsworthy*, No. 06-10012-JGD,

2008 WL 2943398, *2–4 (D. Mass. Jan. 3, 2008) (excluding proffered expert testimony by a lawyer regarding the parties' intent based on the "expert's" review of the contract language); *Cunningham v. Bienfang*, No. 3:00-cv-0448-L, 2002 WL 31553976, *1–3 (N.D. Tex. Nov. 15, 2002) (same); *In re Tasch, Inc.*, No. 97-15901-JAB, 1999 WL 596261, *1–3 (E.D. La. Aug. 5, 1999) (same).

## **RELEVANT FACTS**

Defendant Sanyo North America ("SNA") was a subsidiary of Sanyo Electric Co. Ltd. ("Sanyo Japan"). In 2015, SNA was merged into Defendant Panasonic Corporation of North America ("PNA"). By 2007, Sanyo Japan was a longtime Tier 1 supplier of electronic automotive parts to General Motors ("GM"). Among the parts that Sanyo Japan was developing and supplying to GM in 2007 was the electronic bank for the center consoles in many of its vehicles. In February 2008, SNA and Sanyo Japan approached GM about integrating capacitive touchscreens into the center consoles being furnished by Sanyo Japan. Ultimately, SNA and Sanyo Japan were invited by GM to undertake "Advance Design and Development" directed at integrating capacitive touchscreen technology into center consoles and demonstrating that technology to GM.

Thereafter, SNA and Sanyo Japan contacted a number of Tier 2 suppliers of automotive parts that involve capacitive touch technology, including Nartron. SNA and Sanyo Japan considered using Nartron as a potential Tier 2 supplier at this conceptual stage based on Nartron's representations about the superior functionality of its technology and the company's numerous "wins" in the capacitive touch technology industry. Based on those representations, in 2008 SNA and Nartron commenced negotiations to memorialize their mutual interest in working together. Nartron and SNA exchanged multiple drafts of the DSA, and both Nartron and SNA consulted with counsel, before it was finalized and executed.

6

## LEGAL ANALYSIS

I. **THE TERM "PRODUCTS" AS USED IN THE DSA IS NO LONGER RELEVANT TO THIS CASE; ANY AMBIGUITY REGARDING ITS DEFINITION NEED NOT BE RESOLVED BY THIS COURT.**

In its August 9, 2016 Opinion on the parties' cross-motions for summary judgment, this Court issued two pivotal holdings. First, the Court held that §§ 5.1 and 5.2 of the DSA—the primary provisions Nartron was relying on to seek contractual licensing fees—were inapplicable in the absence of a Product Agreement. (ECF No. 177, PgID.2606-07.) Second, the Court held that an ambiguity existed in the DSA regarding the definition of the term "Product" as used in § 4 of the DSA. (*Id.* at PgID.2607-08.) From the date of this Court's Opinion until Nartron filed its Contract Construction Brief on March 24, 2017 (ECF No. 323), it was unclear which provision(s) of the DSA (other than §§ 5.1 and 5.2) Nartron would claim entitled it to licensing fees. That question has now been answered. Nartron is relying exclusively on § 9.3 of the DSA to support its licensing fee claim.

Section 9.3 of the DSA provides, in full, as follows:

> Except as specifically authorized in the DSA, neither Party may use *Existing Property Rights* or New Property Rights belonging to the other Party without the prior written consent of the other Party in a separate license agreement and the payment of any royalty or other fees set forth in that license agreement as identified in the Product Agreement. For the purpose of clarification, notwithstanding anything contrary herein, Nartron is not authorized to use any intellectual property rights owned by SANYO's parent or other affiliated companies unless otherwise authorized in a separate license agreement and SANYO is not authorized to use any intellectual property rights owned by Nartron's parent or other affiliated companies unless otherwise authorized in a separate license agreement.

(Ex. 1, p. 9, emphasis added.)  The first notable characteristic of § 9.3 is that it contains no reference to the term "Product." Thus, that term has been rendered irrelevant for purposes of this litigation, and the admission of extrinsic evidence on the premise of resolving any ambiguity in that term's

7

use in § 4 and/or § 1.8 is unnecessary and should not be permitted.[2] *Ardent Serv. Corp. v. Grand Beach Real Estate Inv., LLC,* No. 1:12-cv-583, 2014 WL 6073319, at *7 (W.D. Mich. Nov. 13, 2014), *aff'd sub nom. Talmer Bank & Trust v. Minton Firm, P.C.*, 660 F. App'x 439 (6th Cir. 2016) (*citing Detroit Bank & Trust Co. v. Coopes,* 93 Mich. App. 459 (1979)) ("Where *the operative language* of a contract is ambiguous, a court can look to parol evidence to construe it as long as that evidence is not inconsistent with the written words.") (emphasis added); *Penzien v. Dielectric Products Engineering Co., Inc.,* 374 Mich. 444, 449 (1965) ("If the contract in question were ambiguous or 'doubtful,' extrinsic evidence…would be admissible as an aid in construction *of the disputed terms*.") (emphasis added); *In re AmTrust Fin. Corp.*, 694 F.3d 741, 749–50 (6th Cir. 2012) ("Where a contractual provision is subject to two reasonable interpretations, however, *that provision* is deemed ambiguous, and the court may look to extrinsic evidence—additional evidence that reflects the intent of the contracting parties—to help construe *it*.") (internal quotation marks omitted, emphasis added).

## II. NARTRON'S NEW ARGUMENT IS APPARENTLY THAT SANYO MISAPPROPRIATED "EXISTING PROPERTY RIGHTS" PURSUANT TO § 9.3.

Section 9.3, entitled "Use of Property Rights," addresses "Existing Property Rights" and "New Property Rights," and whether they are subject to the DSA.  Section 1.11 defines Existing

---

[2] Nartron's decision to abandon § 4 of the DSA as grounds for obtaining a licensing fee is not surprising.  It is inapplicable for two reasons under its unambiguous language.  First, it addresses only a discrete alternative right of direct sale of "Products developed under any Product Agreement" to customers under certain enumerated circumstances. (Ex. 1, pp. 3–4.) Those circumstances never arose, and no party ever invoked the alternative rights of § 4.  Second, because it deals with the sale of "Products developed *under any Product Agreement*," it is inapplicable for the same reason §§ 5.1 and 5.2 of the DSA are inapplicable; Nartron and SNA never executed an applicable Product Agreement.  Finally, any ambiguity regarding the term "Products" as used in §§ 4 and 1.8 would be immaterial <u>even if</u> it were implicated in this case.  The alternative rights described in § 4 exist "*in addition to*" the parties' other rights under the DSA.  Thus, the additional right to directly sell "Products"—however defined—under § 4 is properly viewed as an alternative, not a conflicting right under the DSA.

8

Property Rights as "intellectual property rights of each party which was [sic] *created outside the scope of this DSA* and Product Agreement." Section 1.12 defines New Property Rights as "intellectual property rights which is [sic] *developed under the scope of the DSA and Product Agreement*." (Ex. 1, p. 3, emphasis needed.) Neither of these definitions is ambiguous.

The term New Property Rights is irrelevant to this Court's construction of the DSA for one simple reason. Under the unambiguous language of § 1.12, New Property Rights are dependent upon the execution of a Product Agreement. Thus, there are no New Property Rights at issue because, by definition, none were ever created. Nonetheless, Nartron's Statement of Controverted Facts and Unresolved Issues for Trial Phase I appears to reflect an assertion that Defendants unlawfully used New Property Rights allegedly arising from the integration of Nartron's alleged "know how" into an automotive console setting. (ECF No. 328-4, PgID.5178.) But in the absence of a Product Agreement, these claims are not legally cognizable under the plain language of §1.12.[3] Thus, Nartron can only be claiming that Sanyo violated § 9.3 with regard to Existing Property Rights. But this too fails to provide Nartron with a path to licensing fees under the DSA.

### III. SECTION 9.3 OF THE DSA IS A PRESERVATION PROVISION THAT DOES NOT CREATE A CONTRACTUAL RIGHT TO A LICENSING FEE FOR EXISTING PROPERTY RIGHTS BY DESIGN.

If § 9.3 is unambiguous as the parties agree, the question is whether it provides Nartron with the contractual right to a licensing fee for misappropriation of Existing Property Rights. It

---

[3] In its Opinion on summary judgment the Court held, "Nartron presents no credible evidence that the product development at issue falls outside the expressed scope of the DSA." (ECF No. 177, PgID.2609.) If, as the Court held, *all* the product development at issue falls *within* the scope of the DSA, then under § 1.12 the only rights Nartron may claim in this action are New Product Rights. But, in the absence of a Product Agreement such rights never came into existence under the DSA. This is yet another reason Nartron's reliance on § 9.3 is misplaced. (*See* Ex. 1, § 1.12, "New Property Rights shall mean intellectual property rights which is developed under . . . [a] Product Agreement.")

9

does not, as a matter of law. Section 9.1 of the DSA is entitled Existing Property Rights and provides, in relevant part, as follows: "Existing Property Rights disclosed by one Party to the other Party for the purposes of conducting a Product Agreement *will remain the property of the disclosing Party*." (Ex. 1, p. 7, emphasis added.) This provision, read in conjunction with § 1.11 (which defines Existing Property Rights as "intellectual property rights of each party which was created outside the scope of the DSA and Product Agreement") makes it clear that Existing Property Rights are unaffected by the DSA and do not become subject to its terms *even* if disclosed to the other party in the course of the parties' development work. Rather, if such disclosure occurs, the parties retain their ownership rights in that property, and it follows their ability to enforce those rights outside the terms of the DSA.

When read in conjunction with § 1.11 and § 9.1, the unambiguous language of § 9.3 merely reiterates that Existing Property Rights arise *outside* the parameters of the DSA, and that its terms do not permit interference with those rights or their use by the other party. In short, § 9.3 is a "carve out" provision preserving the parties' non-DSA rights. It simply acknowledges pre-existing property rights; it does not create them and specifies no right to a licensing fee for misappropriation of them.

But, § 9.3 also explains how the parties can subject Existing Property Rights to the DSA, if they wish to do so. First, the parties agreed that a "separate license agreement" for the Existing Property Right would need to be executed. (Ex. 1, p. 9.) This was necessary because—by its terms—the DSA provides no licensing terms for the use of Existing Property Rights. Then, that "separate license agreement" needed to be "identified in the Product Agreement" that set the "royalty or other fees" to be paid on the Existing Property Right being utilized. *Id.* Only then would Existing Property Rights become subject to and enforceable under the DSA. It is undisputed

that a Product Agreement was not executed by the parties. While Nartron remained free to enforce its retained *ownership* rights (if any) in that alleged property, it has no *contractual* rights to a licensing fee—under § 9.3 of the DSA—to enforce, as they were never perfected through execution of a Product Agreement.

**IV.** **NARTRON REMAINED FREE TO PROTECT AND ENFORCE ITS RETAINED ALLEGED OWNERSHIP RIGHTS IN THE "KNOW HOW" AT ISSUE IN THIS CASE. IT CHOSE INSTEAD TO ATTEMPT TO ENFORCE NON-EXISTENT CONTRACTUAL RIGHTS UNDER THE DSA.**

Simple logic and faithful adherence to the language of the DSA means that Nartron cannot seek a licensing fee for alleged misappropriation of Existing Property Rights under the DSA where the alleged rights were expressly "carved out" of the DSA and no Product Agreement was executed. That does not mean, as Nartron contends in its Contract Construction Brief, that Defendants were free to use any alleged proprietary "know how" without authorization or payment. (ECF No. 323, PgID.5049.) Rather, Nartron could have asserted its alleged property (as opposed to contractual) rights in the "know how" through other avenues, such as the Michigan Uniform Trade Secrets Act ("MUTSA") or a patent infringement claim. Yet, it chose not to do so. It must live with the consequences of that decision.[4]

In sum, under the unambiguous terms of the DSA, the parties chose to hold on to their respective interests in Existing Property Rights rather than subject them to terms of use under the DSA. Nartron is correct that § 9.3 clearly states that the DSA does not authorize the use of Existing Property Rights by the other party. But "not authorizing" is not the same as creating a contractual right to a licensing fee; in fact, it is just the opposite. Consistent with §§ 1.11 and 9.1, the

---

[4] This is not the first time Nartron has required several years of intense litigation before understanding this basic principle. *See In re Nartron Corp.*, 330 B.R. 573, 584 (Bankr. W.D. Mich. 2005) ("Which brings us to a recurring theme in this bankruptcy case, to wit, the inability or refusal of Nartron's management to recognize that for every choice there is a consequence.").

declaration of retained rights in § 9.3 means that Existing Property Rights stand apart from the DSA, and remain enforceable by extra-contractual means <u>unless</u> made the subject of a separate licensing agreement as identified in a Product Agreement. Only then does a contractual right to a licensing fee arise.[5]

## V. UNDER ITS UNAMBIGUOUS TERMS, THE DSA EXPIRED ON APRIL 2, 2012.

The parties agreed that the effective date of the DSA would be April 2, 2008. The DSA became operative on April 2, 2008 regardless of when it was actually executed. *See Mut. Life Ins. Co. of N.Y. v. Hurni Packing Co.*, 263 U.S. 167, 175–76 (1923) ("It was competent for the parties to agree that the effective date of the policy should be one prior to its actual execution or issue."); *Giles v. Univ. of Toledo*, 478 F. Supp. 2d 942, 951–52 (N.D. Ohio 2007), *aff'd*, 286 F. App'x 295 (6th Cir. 2008) ("The Sixth Circuit has recognized there is no law limiting authority to make provisions of an agreement retroactive."); *see also Grubb & Ellis Co. v. Bradley Real Estate Trust*, 909 F.2d 1050, 1054 (7th Cir. 1990) ("In the law of contracts, it is elementary that ordinarily a

---

[5] A holding that Nartron has no contractual right to recover a licensing fee under the DSA would ***not*** conflict with this Court's prior holding that Nartron's unjust enrichment claim was barred by the existence of the DSA. The case of *KSR Int'l Co. v. Delphi Automotive System, LLC*, 523 Fed. App'x 357 (6th Cir. 2013) is analogous and instructive on this point. In that case, the plaintiff ("KSR") brought both an unjust enrichment and breach of contract claim against the defendant ("Delphi"). KSR, a tier 2 automotive supplier, alleged that the plain language of the contract required Delphi (a tier 1 supplier) to pay for KSR's pre-production engineering, development, and testing of the product that it sold to Delphi. The district court disagreed, finding that the contract did not include an agreement to pay such costs. *Id.* at 361. In addition, the district court dismissed KSR's unjust enrichment claim because the parties' contract covered the same subject matter. *Id*. The Sixth Circuit affirmed, explaining that "the law will not imply a contract to rescue [a plaintiff] from its failure to obtain [a defendant's] contractual agreement to pay . . ." *Id.* The same rational applies here. This Court correctly held that the DSA covers the same subject matter as Nartron's unjust enrichment claim. In any event, Nartron's unjust enrichment claim is clearly barred by MUTSA. *See Bliss Clearing Niagara, Inc. v. Midwest Brake Bond Co.*, 270 F. Supp. 2d 943, 948–49 (W.D. Mich. 2003) (dismissing common law claims as preempted by MUTSA despite the disputed status of information as trade secret); *Wysong Corp. v. M.I. Indus.*, 412 F. Supp. 2d 612 (E.D. Mich. 2005) (MUTSA displaced plaintiff's unjust enrichment claim to the extent that the claim alleged enrichment from misappropriation of a trade secret).

contract speaks from the day of its date, regardless of when it was executed and delivered.").

Section 7.1 of the DSA provides as follows:

> The term of this Agreement shall be the greater of four years* or the latest completion date of any Product Agreement, unless modified or terminated by written mutual consent by the Parties. (*See Note 1)[6]

As this Court has already found, there was no Product Agreement between the parties regarding capacitive touch technology and none which had a "completion date" later than April 2, 2012. Thus, by its unambiguous terms, the DSA expired on April 2, 2012.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that this Court find that § 9.3 of the DSA is both unambiguous and inapplicable to the claims asserted in this case. The Court should further find that by its unambiguous terms, the DSA expired on April 2, 2012.

                                                Respectfully submitted,

Dated: March 31, 2017                /s/John E. Anding
                                              John E. Anding (P30356)
                                              Amanda P. Narvaes (P74957)
                                              LaRissa D. Hollingsworth (P62774)
                                              **DREW, COOPER & ANDING, P.C.**
                                              Aldrich Place, Suite 200
                                              80 Ottawa Avenue NW
                                              Grand Rapids, MI 49503
                                              (616) 454-8300
                                              *Attorneys for Defendants*

---

[6] "Note 1" in the DSA merely states, "it typically takes a product 3 years to launch [sic] the automotive industry." This does not alter the unambiguous language of § 7.1.

## **CERTIFICATE OF SERVICE**

I certify that on March 31, 2017, the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

Dated:  March 31, 2017 /s/John E. Anding
John E. Anding (P30356)
Amanda P. Narvaes (P74957)
LaRissa D. Hollingsworth (P62774)
**DREW, COOPER & ANDING, P.C.**
Aldrich Place, Suite 200
80 Ottawa Avenue NW
Grand Rapids, MI 49503
(616) 454-8300

I:\JEA-Team\3474-01\Construction.Trial.Brief.Response(120.135)