# EXHIBIT 1

CONFIDENTIAL

DEVELOPMENT AND SUPPLY AGREEMENT

This Agreement is made and entered into as of the 2nd of April, 2008 between Nartron Corporation, a Michigan corporation having its offices at 5000 North US-131, Reed City, Michigan (hereafter "Nartron") and SANYO Automotive U.S.A., Inc., a Michigan corporation having offices at 27000 Meadowbrook Road, Novi, Michigan 48377-3524 (hereinafter "SANYO").

WHEREAS, the Parties have executed a Mutual Confidentiality Agreement dated March 7, 2008.

WHEREAS, the Parties are interested in developing a relationship whereby SANYO or Nartron, or the Parties Jointly, will conduct engineering projects to develop products directed at Original Equipment Manufacturer customers of Parties ("Products").

WHEREAS Nartron:

- Has resources and experience in designing, developing and manufacturing innovative products including components, sub-systems and systems employing electronic and electro mechanical technologies for Original Equipment Manufacturer applications (hereafter "Nartron Products);

- Products relating to design and/or development included but not limited to the following:

    - Non-contact solid state sensing and control
    - Smart Touch® Center Stack
    - Electronic control modules

- Wishes to manufacture for SANYO Products or components and subsystems developed in the pursuit of the Products.

- Wishes to have SANYO manufacture components or sub-systems as a contract manufacturer.

WHEREAS, SANYO:

- Designs, develops and manufactures systems, sub-systems, and components, for use in Original Equipment Manufacturer applications;

- Wishes to source to Nartron any or all parts of design, development and manufacture of Products (primarily components and sub-systems containing electro mechanical, electrical and/or electronic components); and

EXHIBIT NO. 7

DATE: _____
KATHRYN L. JANES, CSR, RMR, CRR

- Wishes to utilize Intellectual Property, technology, know-how, patents, trade secrets and non-patentable inventions owned or created by Nartron and/or SANYO, applied to Products.

- Wishes to manufacture products, components and sub-systems on a contract basis for Nartron.

NOW, THEREFORE, the Parties agree as follows:

1. Definitions

    1.1  "Advanced Product Quality Planning" "or APQP" shall mean Parties disciplined process for launching new products for sale to its customers.

    1.2  "Original Equipment Manufacturer" shall mean an original equipment manufacturer or tiered suppliers to any such manufacturer.

    1.3  "Intellectual Property" shall mean know-how, one or more patents, trade secrets, and non-patentable inventions.

    1.4  "Parties" and "Party" shall mean SANYO and Nartron.

    )

    1.4.1 Lead Party (Buyer) shall mean party selling the product to the Original Equipment Manufacturer

    1.5  "Proof-of-Concept" shall mean engineering prototypes built for evaluation and testing technology applied to a Product to determine its suitability.

    1.6  "Purchase Order" shall mean a contract issued by SANYO or Nartron to purchase materials, services, tooling or products pursuant to specific terms and conditions.

    1.7  "SOP" shall mean start of production, the date production commences for the end user (Original Equipment Manufacturer), for a Product.

    1.8  "Products" shall mean Products individually identified in Product Agreements that shall define the scope, business objectives and responsibilities of the Parties.

    1.9 "Parties System" shall have the meaning given to it in Section 5.1.

1.10 Appendix A Chart is for reference only. The written DSA governs the relationship of the Parties.

1.11 "Existing Property Rights" shall mean intellectual property rights of each party which was created outside the scope of this DSA and Product Agreement.

1.12 "New Property Rights" shall mean intellectual property rights which is developed under the scope of this DSA and Product Agreement.

2. Development of Product Agreements

   2.1 The Parties agree to jointly identify Products to be covered under the Product Agreement. The Parties shall create a Statement of Work for each Product, which shall contain at least the following elements:

   2.1.1 Business objective: volume, price target, customer(s), general performance objective.
   2.1.2 Technical specification or in the alternative, a development program or contract to develop such a Product through Proof-of-Concept.
   2.1.3 Timeline (including SOP) and completion date of Product Agreement.
   2.1.4 Responsibilities of each Party in a form with specific deliverables.
   2.1.5 Program Management (scope and responsibility).
   2.1.6 Cost sharing or expense absorption.
   2.1.7 Tooling responsibility (prototype and/or volume production).
   2.1.8 Any other related costs or exposures.

   2.2 The Product Agreement and Statement of Work must be agreed by both Parties.

3. Funding Products

   SANYO and Nartron will each bear its own development and prototype cost for a Product unless customer funded. The customer funded sharing will be defined in the Product Agreement. It is agreed that the Parties will identify in the Product Agreement the Lead Party and said Lead Party will primarily provide and bear the cost of personnel resources related to market, customer and regulatory requirements and will provide whole system testing and design services where applicable. The Parties will primarily provide and bear the personnel and other costs of component selection, fabrication, prototype build and component testing support.

4. Exclusive Relationship for Products

   Parties will have, in addition to any rights arising under this Agreement, the right to sell to any customer, Products developed under any Product Agreement and its related statement of work to such customer if, and only if it is mutually determined

that the Lead Party fails to (a) use commercially reasonable efforts to market and sell Products or, (b) obtain the award of Products at such customer or, (c) purchase Products from identified preferred supplier source or, (d) a customer refuses to purchase Products from the Lead Party. Parties shall hold all ownership and licensing rights to all Products developed or produced under this Agreement if they are not incorporated into, or made the subject of, a Product Agreement, unless otherwise agreed, in writing, between Nartron and SANYO.

5. Preferred Supplier/Exclusive Status

   5.1 Nartron or Sanyo shall be designated as a Preferred Supplier (Seller) or Lead Party (Buyer) for each Product Agreement that is incorporated into an Original Equipment Manufacturer component, sub-system or system to be sold by the Parties to an Original Equipment Manufacturer (hereafter a "Parties System"). Subject to the provisions of Section 4, Preferred Supplier (seller) shall be awarded a three-year exclusive supply or 100% of Parties requirements for Products having a Product Agreement. Such three-year exclusive supply period shall start from the effective date of Product Agreement. Notwithstanding the above, each Product Agreement contains financial obligations and/or compensation; Parties reasonable costs incurred and its lost profits and in the event the product is voided by the Parties, per Section 4.

   5.2 This exclusive period shall not bind the Parties in the event that one of the Parties is unable to deliver acceptable Products on-time to meet the Parties reasonable lead times (quoted lead times) or poor quality. Further, the Parties agree to assist each other in identifying an alternate supplier, acceptable to the Lead Party, to assure uninterrupted Product supply. The Parties also agree to license to the other Party all industrial and intellectual property owned by the Party that is necessary for the Party to make or have made such Product(s). Unless otherwise defined in a product agreement the license is at 10% of the "Lead Parties System" sale price to a customer of the "Parties System" or any variants made. Each Product Agreement will specify the License, technology access and know-how and License rate. The Parties may not assign this Agreement (by operation of law or otherwise) without the prior written consent of the other Party, which consent shall not be unreasonably withheld or delayed. This Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective permitted successors and assigns. Any attempt by a Party to assign this Agreement other than as permitted in this Agreement shall be null and void. The License is non-transferable by acquisition or sale by the Parties without written approval of the other Party.

   5.3 In the event that either Party is unable to market a Product due to rejection or cancellation of business opportunity by an Original Equipment Manufacturer or the failure of a Product to meet the Parties or Original Equipment Manufacturer's requirements, such as quality of the Product or breech of the Parties, the Parties shall each absorb their portion of the Product Agreement

expenses, unless a defined condition allocating such expenses exist in the applicable Product Agreement.

5.4 In the event either Party is unwilling to market a Product developed under a Product Agreement for any reason than set forth in Section 5.3, the other Party will be entitled to recover from the unwilling Party reasonable costs incurred by other Party during the Product Agreement. The accounting method to be used in such consideration of reasonable costs shall be costs for labor, materials, and equipment use. However, if other Product(s) are derived, or likely to be derived, from the Product Agreement, the Parties recovery will be delayed or deferred in consideration of such other Product(s).

6. Obligations of the Parties for Commercial Sale of Products

6.1 In the event either Party purchases a Product resulting from a Product Agreement for incorporation into a Parties System for sale by Parties to an Original Equipment Manufacturer, pursuant to Section 5.1, each party shall have specific obligations in relation to the manufacture and sale of such Products as follows:

Obligations of Buyer/Seller and Parties

6.1.1 Lead Party (Buyer) shall purchase from Preferred Source (Seller), at a mutually agreed price, Products for incorporation into a Parties System for use in an Original Equipment Manufacturer application in accordance with Buyer specifications and standard terms and conditions of purchase pursuant to Buyer Purchase orders and releases issued for this purpose. Where a conflict exists between this Agreement and Buyer's standard terms and conditions of purchase or Buyer's Purchase Order this Agreement shall govern.

6.1.2 Buyer shall be the tier supplier for any Parties Product Agreement developed and sold for incorporation into a Parties System for use by an Original Equipment Manufacturer pursuant to this Agreement and will facilitate all communication, negotiation and interaction with Original Equipment Manufacturers including interface with engineering, quality control and purchasing personnel.

6.1.3 Buyer shall be responsible to facilitate the communication with Original Equipment Manufacturers for all design aspects of Product Agreement, and for obtaining all engineering reviews, approvals and changes from any Original Equipment Manufacturer, with appropriate communication to and input from Seller.

6.1.4 Buyer will initiate, execute and manage its APQP program at both its and Seller's manufacturing facilities for all Products manufactured for or services provided by either Party pursuant to this Agreement for sale to Original Equipment Manufacturers unless otherwise agreed in the Product Agreement.

- 6.1.5 Buyer shall be responsible and shall defend and indemnify Seller and its directors, employees, agents, customers, and users, successors and assigns from and against all claims, liabilities, suits, damages, losses, costs and expenses (including attorney's fees and legal costs) actually or allegedly arising from any personal injury, death, economic or property loss or damage caused by Buyer's negligent or willful acts or omissions in manufacturing or designing products for Original Equipment applications (including defects resulting in recall or service campaign).Except in case liability arises out of a reason solely attributed to the Seller.

- 6.1.6 Either Party, as a contract manufacturer, shall sell to the other Party, at a mutually agreed price, Products as a tiered supplier for incorporation into a Nartron or Sanyo System for use by an Original Equipment Manufacturer in accordance with Buyer's specifications and standard terms and conditions of purchase pursuant to Purchase Orders and releases issued by Buyer for this purpose. Where a conflict exists between this Agreement and Buyer's Purchase Order this Agreement shall govern.

- 6.1.7 To the extent there is a conflict or a material difference between the standard terms and conditions in Seller's quotations and estimates, on the one hand, and Buyer's purchase orders, on the other, Seller's standard terms and conditions shall be deemed to supersede, nullify, and take precedence over Buyer's standard terms and conditions.

7. Term

    7.1 The term of this Agreement shall be the greater of four years* or the latest completion date of any Product Agreement, unless modified or terminated by written mutual consent by the Parties. (* See Note 1)

    7.2 Failure to perform on the part of either party on any Product Agreement shall constitute breach of such Product Agreement and shall provide the right to terminate such Product Agreement by the aggrieved party, with thirty days written notice; Sections 5.1, 5.3 and 5.4 apply upon termination. (* See Note 2)

8. Intellectual Property

    8.1 Trade secrets, non-patentable inventions and other confidential information in existence prior to the date of this Agreement shall remain the property of the disclosing party.

    8.2 If any specific Product is terminated, the recipient will return to the disclosing party all copies of Confidential Information, disclosed to it by the other party, and it will destroy all copies of analyses, compilations, studies, and other documents prepared by recipient containing or reflecting any Confidential

Information disclosed to it by the other party. Confidential Information shall mean information described in the Mutual Confidentiality Agreement dated March 7, 2008 between Nartron and SANYO.

9. Property Rights

   9.1 Existing Property Rights

   Existing Property Rights disclosed by one Party to the other Party for the purposes of conducting a Product Agreement will remain the property of the disclosing Party. The Party disclosing an Existing Property Rightand is not either the subject of a patent application, patent, registered trademark, copyrighted, or otherwise clearly marked as its property is responsible for notifying the other Party that it claims ownership of that Existing Property Right. The other Party will only be entitled to use Existing Property Rights in connection with Product Agreements and the sale and marketing of Parties Systems (a) resulting from Product Agreements, and (b) containing components manufactured by the Parties to this Agreement, and in accordance with any reasonable limitations or restrictions imposed by the Party owning the Existing Property Rights. Any Existing Property Rights that are Confidential Information will remain subject to the Confidentiality Agreement, and may not be disclosed to any third parties including third parties involved in a Product Agreement without the written consent of the Party owning that Confidential Information.

   9.2 New Property Rights

   (a) Each Party will inform the other Party about any invention or discovery resulting in a New Property Right that has been developed by its agents or employees and covered by the scope of this DSA promptly after that New Property Right has been developed.

   (b) Each New Property Right conceived or first reduced to practice solely by one or more employees of Nartron under this DSA will become the sole property of Nartron and will be treated as Confidential Information belonging to Nartron (*"Nartron New Property Right"*). Nartron may at its expense protect and register any Nartron New Property Right. If and to the extent required by applicable law, Nartron will at their expense compensate any Sanyo employees whose invention or work is embodied in any Nartron New Property Right. Unless otherwise agreed by Nartron in writing, Sanyo may only use Nartron New Property Rights in connection with this DSA and the marketing and sale of Parties Systems containing components manufactured by both Parties, and in accordance with any reasonable limitations or restrictions imposed by Owning Party.

(c) Each New Property Right conceived or first reduced to practice solely by one or more employees of Sanyo under this DSA will become the sole property of Sanyo and will be treated as Confidential Information belonging to Sanyo ("*Sanyo New Property Right*"). Sanyo may at its expense protect and register any Sanyo New Property Right by filing the appropriate application with applicable government authorities, and Nartron will cooperate with Sanyo (at Sanyo's expense) in connection with that filing. Unless otherwise agreed by Sanyo in writing, a Nartron may only use Sanyo New Property Rights in connection with this DSA and the marketing and sale of Product Agreement containing components manufactured by both Nartron Party and Sanyo, and in accordance with any reasonable limitations or restriction imposed by Sanyo.

(d) Each New Property Right conceived or first reduced to practice jointly by one or more of the employees of one party with one or more employees of the other parties will become the joint property of the Parties and will be treated as Confidential Information belonging to both Parties ("*Joint New Property Right*"). If and to the extent required by applicable law, each Party will at its expense compensate any of its employees whose work is embodied in any Joint New Property Right. Joint New Property Rights will be at the disposition of each Party and its Affiliates for use free of charge, but neither Party may grant licenses in Joint New Property Rights to third parties (other than licenses which are needed to use products manufactured by either Party that embody Joint New Property Rights) without the prior written consent of the other Party.

(e) If either Party wishes to register any Joint New Property Right with applicable government authorities, it will so notify the other Party. Within thirty (30) days after receipt of a notice proposing registration, the Party receiving the notice will notify the Party wishing to register whether or not it will participate in the registration or whether it objects to the registration (and if so, the reasons for the objection). Unless one Party waives its participation or objects, applications or registration of Joint New Property Rights may only be filed by the Parties jointly, and the Parties will determine the main responsibility for the application in each individual case. Third party application expenses incurred in a joint registration (attorney's fees, patent fees, etc.) will be shared equally by the Parties. If one Party declines or refuses to participate in a joint registration of a Joint New Property Right and does not raise a reasonable objection to registration by the other Party, the other Party may register the Joint New Property Right in its sole name and at its sole expense, and the non-participating Party will lend (at the registering Party's expense) any assistance reasonably requested by the registering Party. If a Party raises a reasonable objection to registration of a Joint New Property Right, the parties will attempt in good faith to resolve the objection amicably, and until the objection is resolved amicably or by court order, neither Party may register or disclose the Joint New Property Right. Reasonable bases for objection to a request for registration of a Joint New Property Right include without limitation the costs of registration in relation to the benefits of registration and the difficulty of enforcing proprietary

rights in a Joint New Property Right if the invention is disclosed to the public as a result of the registration process.

9.3 Use of Property Rights

Except as specifically authorized in this DSA, neither Party may use Existing Property Rights or New Property Rights belonging to the other Party without the prior written consent of the other Party in a separate license agreement and the payment of any royalty or other fees set forth in that license agreement as identified in the Product Agreement. For the purpose of clarification, notwithstanding anything contrary herein, Nartron is not authorized to use any intellectual property rights owned by SANYO's parent or other affiliated companies unless otherwise authorized in a separate license agreement and SANYO is not authorized to use any intellectual property rights owned by Nartron's parent or other affiliated companies unless otherwise authorized in a separate license agreement.

10. This Agreement shall be governed by and interpreted in accordance with the laws of the State of Michigan and any disputes under this Agreement shall be subject to the exclusive jurisdiction and venue of the Michigan state courts and the Federal courts located in Michigan and the Parties hereby consent to the personal and exclusive jurisdiction and venue of these courts. The Parties acknowledge and confirm that they have selected the laws of the state of Michigan as the governing law for this Agreement in part because jury trial waivers are enforceable under Michigan law. The Parties further acknowledge and confirm that the selection of the governing law is a material term of this Agreement.

11. In the event of any dispute between the Parties, whether it results in proceedings in any court in any jurisdiction or in arbitration, the Parties hereby knowingly and voluntarily, and having had an opportunity to consult with counsel, waive all rights to trial by jury, and agree that any and all matters shall be decided by a judge without a jury to the fullest extent permissible under applicable law.

IN WITNESS WHEREOF, the Parties have executed this Agreement on the day and year first written above.

Nartron Corporation
By: _____
John Washeleski
Title: Senior Vice President, Engineering
Date: 4/02/08

SANYO Automotive U.S.A., Inc.
By: _____
Title: Vice President General Mgr
Date: 4/02/08

**Addendum 1**

## PRODUCT AGREEMENT – _____

### SCOPE
This Product Agreement is a supplemental agreement to the Development and Supply Agreement between Nartron Corporation and SANYO, dated _____.

This Product is a _____
_____
_____
_____.

### BUSINESS OBJECTIVE
Volume: _____ units per year
Controller Target Price: $\_\_\_\_/each; tooling - $\_\_\_\_; project completion & validation - $\_\_\_\_. Responsibility: SANYO   -   _____;   Nartron   —
_____
Customer: _____.
Controller Performance: defined in Specification # _____.
Prototypes: \_\_\_\_\_ pieces; Date: _____
Production timing: _____.
Completion date: _____.

License Agreement: _____.

### RESPONSIBILITIES
SANYO will provide additional technical requirements if required in a Specification Document including specific tests to verify design and product functionality. SANYO will be the lead interface for the Product(s); Nartron will support as, and where, required.

Test information will be freely exchanged between SANYO and Nartron with respect to testing of the _____.

### COST SHARING
SANYO will issue Purchase Orders for prototypes used throughout development. Costs to be agreed upon through the RFQ/Quotation process.

Personnel costs of participating in normal program reviews, testing, or other usual product development activities will be the responsibility of each individual company. Circumstances requiring unusual expenditures will be covered by mutual agreement before the event, through the RFQ/quote process.

## Notes

Note 1: It typically takes a product 3 years to launch the automotive industry.

Note 2: Sections to be evaluated upon termination of any Product Agreement.

# APPENDIX A
## SANYO / NARTRON ALLIANCE PARTNERSHIP
## CHART FOR DEVELOPMENT & SUPPLY AGREEMENT DATED APRIL 2, 2008



Revision 8 8.1.08        12 of 12