UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

OLDNAR CORPORATION, f/k/a
NARTRON CORPORATION, a/k/a
GEN X MICROSYSTEMS, INC.,

    Plaintiff,

v.

SANYO NORTH AMERICA
CORPORATION and PANASONIC
CORPORATION OF NORTH AMERICA,

    Defendants.
_____/

Case No. 1:13-cv-1064

HON. JANET T. NEFF

## OPINION AND ORDER

On remand from the U.S. Court of Appeals for the Sixth Circuit, this Court must determine: (1) what, if any, intellectual property/know-how of Nartron Corporation (Nartron) Defendants used; and (2) whether that use was unauthorized (Order, ECF No. 394; Order, ECF No. 431). *See Oldnar Corp. v. Panasonic Corp. of N. Am.*, 766 F. App'x 255, 265 (6th Cir. 2019). The Court held an evidentiary hearing on July 9, 2020 and received briefing from the parties on the issues: Nartron's Evidentiary Hearing Brief (ECF No. 405); Defendants' Evidentiary Brief (ECF No. 420); Nartron's Closing Brief (ECF No. 434); Defendants' Closing Brief (ECF No. 436); and Nartron's Post-Hearing Reply Brief (ECF No. 438). For the following reasons, the Court concludes that Defendants made use of Nartron's know-how and that the use was unauthorized.

### I.   FACTS

This dispute concerns Nartron's contribution to Defendants' receipt of a production order from General Motors (GM) for the Cadillac User Experience (CUE) touchscreen center console

(Revised Joint Statement of the Case, ECF No. 412).  Defendants, a supplier to GM of the automotive dashboard integrated center stack (ICS), were focused, at the beginning of 2008, on transferring capacitive touch (no tactile pressure) technology, found in such consumer products as cell phones, to the automotive environment, specifically, for GM (ECF No. 420 at PageID.6241; Transcript Evidentiary Hearing, ECF No. 433 at PageID.6774).

Defendants engaged with multiple suppliers of capacitive touchscreen technology, including Nartron, which was a forerunner in the market, to achieve a solution for the automotive dashboard (ECF No. 420 at PageID.6241; ECF No. 433 at PageID.6869).  Ultimately, Nartron and Defendants entered into a four-year Development and Supply Agreement (DSA) for the development of interactive touchscreen car consoles (ECF No. 420 at PageID.6241; ECF No. 434 at PageID.6984-6985).[1]

To become GM's new product offering supplier involved a multi-stage development process: (1) proof-of-concept development phase; (2) advanced development—feasibility of application phase; (3) design and development supplier nomination phase/preproduction purchase order; and (4) production purchase order (ECF No. 420-1 at PageID.6283; ECF No. 433 at PageID.6773, 6795, 6875; ECF No. 434 at PageID.6985-6986).  As Defendants admit, Nartron was instrumental in helping Defendants secure the contract for the CUE (ECF No. 433 at PageID.6779-6780, 6878).  In the initial phases of development, Nartron was the lead demonstrator of the idea that charge transfer sensing was effective in meeting the needs of the project, namely, transmitting a charge through a thick plastic face plate, including with gloved-hand subjects.  Still,

---

[1] Defendants make the internally inconsistent argument that the DSA "was non-exclusive and did not relate to any specific product, technology or customer" (ECF No. 420 at PageID.6241) but that Nartron is entitled to royalties under the DSA only if Nartron's technology was utilized by Defendants in the CUE (ECF No. 420-1 at PageID.6258-6260, 6287).

2

as the project progressed, Nartron did not become the supplier of choice, to the point of implementing its idea in a production-capable model (*id.* at PageID.6826, 6828-6830, 6798; ECF No. 420-1 at PageID.6253).

During an approximately twenty-month period from March 2008 to November 2009, Nartron took Defendants to the third stage of the developmental process by showing Defendants how capacitive touch systems work, including "what Defendants should and should not do," through at least fifteen prototypes, which Nartron produced for Defendants (ECF No. 433 at PageID.6760-6761, 6768, 6784, 6809, 6875, 6884). Nartron also participated in demonstrations with Defendants to GM of prototypes containing Nartron's capacitive touch technology (*id.* at PageID.6759, 6927-6928).

During the first two stages of development from March 2008 to September 2009, Nartron and Nartron's technology were prominently featured at preproduction prototype and engagement meetings with GM (ECF No. 433 at PageID.6768-6769, 6787, 6927). This included the proof-of-concept phase, from March 2008 to October 2008, where Nartron showed, for example, that charge transfer sensing can work with a thick sensing layer or plastic face plate, and the advanced development phase from October 2008 to September 2009 (ECF No. 433 at PageID.6793, 6828, 6830).

The CUE project acquired greater shape and focus during the design and development phase. This phase lasted approximately sixteen months, from the time Defendants selected Atmel Corporation (Atmel) in November 2009 as the project supplier, to the production order, in which the ICS with capacitive technology was engineered and customized to GM's specifications and a complete integrated solution was delivered (ECF No. 433 at PageID.6805, 6807). In April 2011, GM awarded the CUE production contract to Defendants (ECF No. 420 at PageID.6243).

3

As late as July 2009, Nartron was still the frontrunner supplier on the project (ECF No. 433 at PageID.6869-6870). Nartron's technology was used in the prototype sample provided to GM in response to GM's Request for Quotation (RFQ), although Defendants used the price quote of another supplier, Atmel. The response to the RFQ enabled Defendants to advance to the next phase development and secure the design development preproduction purchase order in September 2009 (*id.* at PageID.6775-6777, 6797, 6803; ECF No. 420-1 at PageID.6274-6275). GM even bought the prototype from Defendants, for which Defendants provided payment to Nartron of approximately $55,000.00 (ECF No. 433 at PageID.6790, 6810, 6871; ECF No. 436 at PageID.7124). The prototype purchase order was for the sample itself, did not include the software source code, and the order stated that the buyer should acquire no interest in any proprietary design or other intellectual property evident in the goods (ECF No. 274-3 at PageID.3872; ECF No. 433 at PageID.6871, 6865; ECF No. 438 at PageID.7246).[2]

In November 2009, Defendants selected Atmel as the project supplier and its microchip Application Specific Integrated Circuit (ASIC) capacitive touchscreen technology (ECF No. 420 at PageID.6243; ECF No. 433 at PageID.6784). Nartron no longer provided know-how on the project after November 2009 (ECF No. 433 at PageID.6808).

The choice of Atmel was based on such sourcing considerations as: product quality and reliability; product cost and supplier delivery time effectiveness; product and supplier readiness for vehicle production and scaling—including product touch accuracy and design compactness (*id.* at PageID.6795, 6797-6798, 6803, 6830, 6887, 6898-6899; ECF No. 436 at PageID.7118).

---

[2] "Prototypes and engineering samples are furnished to Customer for experimental use, testing and engineering approval only. Notwithstanding any term in buyer's purchase order, or other document of buyer to the contrary, buyer shall acquire no interest in any proprietary design or other intellectual property of seller evidence in the goods applied by seller pursuant to buyer's order" (ECF No. 274-3 at PageID.3872).

Atmel's capacitive technology went into the production of the Cadillac CUE. Even if Nartron was the preferred supplier at one time, it never delivered a timely, integrated solution, and the effectiveness of Atmel's technology for the ICS eventually eclipsed Nartron's (ECF No. 420-1 at PageID.6271, 6285-6286; ECF No. 433 at PageID.6771, 6788, 6807-6809, 6869, 6898, 6912, 6927).

Nevertheless, Nartron argues that but for the use of its technology and know-how Defendants would not have received the contract award, and Nartron should be compensated accordingly (ECF No. 434 at PageID.6983; ECF No. 438 at PageID.7245).

## II. ANALYSIS

Nartron argues that it need only prove that Defendants used its intellectual property/know-how because any use of Nartron's know-how is a violation of the DSA (ECF No. 438 at PageID.7244, quoting and citing *Oldnar*, 766 F. App'x at 265). Defendants argue that Nartron must still prove that: (1) Nartron owned ideas (i.e. that they were not in the public domain), (2) Nartron revealed or shared its ideas with Defendants, (3) Nartron took steps to keep these ideas secret, and (4) the ideas are in the CUE (ECF No. 420 at PageID.6246-6247).

The DSA broadly defines "intellectual property" in section 1.3 as "know-how, one or more patents, trade secrets, and non-patentable inventions" (DSA § 1.3, ECF No. 32-2 at PageID.291). *See Oldnar*, 766 F. App'x at 257. At this stage, the Court understands the disputed issue to be whether Defendants used Nartron know-how and whether that use was unauthorized (i.e. without permission and payment).[3] *See* DSA § 9.3, ECF No. 32-2 at PageID.299; *Oldnar*, 766 F. App'x

---

[3] Defendants also assert that the sole threshold question at this stage is what legally protectable know-how owned by Nartron can Nartron prove was used by Defendants without authorization (ECF No. 420 at PageID.6244).

at 265. The Court therefore addresses each of these issues in turn: (a) what know-how of Nartron did Defendants use?; and (b) was the use unauthorized?

*A. What Know-How of Nartron Did Defendants Use?*

The DSA does not define "know-how."[4] "Know-how" is generally defined as

> factual knowledge not capable of precise, separate description but which, when used in an accumulated form, after being acquired as the result of trial and error, gives to the one acquiring it an ability to produce something which he otherwise would not have known how to produce with the same accuracy or precision found necessary for commercial success.

*Hooker Chem. Corp. v. Velsicol Chem. Corp.*, 235 F. Supp. 412, 424 (W.D. Tenn. 1964).

Nartron alleges that its know-how makes up the capacitive sensing technology in the July 2009 prototype demonstrated and provided to GM, including: (1) the design and fabrication of the touch screen and button sensors, (2) the choice of charge transfer capacitive sensing, (3) periodic, square wave excitation signals for the touch screen and button sensors, and (4) separate processors and sensors for the touch screen and the buttons (ECF No. 405 at PageID.6168-6169). Nartron further alleges that Defendants "won the CUE production order by demonstrating and representing to GM that it was using Nartron's capacitive sensing technology" (*id.* at PageID.6169-6170).

Even though Defendants ultimately used Atmel's specialized capacitive sensing chip in the final production, Nartron claims that the final product demonstrates Nartron's know-how: the charge transfer capacitive sensing method that it taught to Defendants and demonstrated would meet GM's requirements (*id.* at PageID.6170). Specifically, the use of charge transfer capacitive

---

[4] Nartron put forward the following definition of know-how: "the learning, ability and technique to do something that is considered intangible property in which rights may be bought or sold" and "practical knowledge or skill; expertise" (ECF No. 438 at PageID.7245, citing and quoting Black's Law Dictionary and Oxford Dictionary and citing *Trustees of Univ. of Pennsylvania v. St. Jude Children's Rsch. Hosp.*, 982 F. Supp. 2d 518, 534 (E.D. Pa. 2013)).

sensing to reliably detect touches through a thick plastic cover plate as well as other design choices Nartron imparted to Defendants to transfer capacitive touch technology to the automotive environment for GM (*id.*; ECF No. 433 at PageID.6816-6817, 6830, 6837).

Defendants' theory is that Nartron cannot recover because it is Atmel's patented intellectual property and charge transfer capacitive circuit that is in the CUE; Nartron presented no evidence that it owned the technology or design choices it demonstrated and that were in the public domain; and Nartron never provided Defendants the software source code to enable Defendants to reproduce the results achieved in the prototype demonstrations (ECF No. 420 at PageID.6240, 6244, 6246, 6248; ECF No. 436 at PageID.7121).

The Court finds that Nartron provided the idea for the project: how the capacitive touchscreen technology could work in the ICS through the charge transfer method; and Nartron demonstrated the technology through prototypes and the prototype that GM bought, which enabled Defendants to advance to the design and development phase (ECF No. 433 at PageID.6955; ECF No. 434-4 at PageID.7015).  Even if Nartron's models remained embryonic and inapt for production and scaling, Nartron developed a solution and showed how charge transfer could work in an ICS, which Defendants adopted.

Additionally, the Court finds that Defendants' source code argument cannot carry the day. Clearly, GM paid for the prototype for a reason; it would not have paid Defendants for a prototype of crude parts or an unworkable model.  Therefore, the Court finds that the source code did not determine the total functioning of the prototype because GM paid for the prototype (i.e. acknowledged its use value).

Nartron's role in the project enabled Defendants to advance to the third stage in development. Nartron was a proximate cause of Defendants' advancement through the

development stages because it gave to Defendants throughout the first two stages of development of the CUE valuable know-how: the ability to produce something which Defendants would not have known how to produce without Nartron. *See Hooker Chem.* at 424, 430. Nartron was a significant factor in the progression of the project. Even if Atmel's microchip technology is in the CUE, Nartron provided the idea for the use of the charge transfer method in the CUE.

The next question for the Court is whether that use, which secured the design and development stage award, was unauthorized, namely, whether Defendants paid for the idea.

*B. Was the Use Unauthorized?*

Nartron argues that Defendants paid only for the goods or parts, not the ideas or smarts contained in the prototype (ECF No. 438 at PageID.7246). Defendants respond that they paid for the prototype for the purpose of demonstrating the technology to GM, which Nartron was aware of, since Nartron participated in the demonstration that helped secure the preproduction design and development order (ECF No. 433 at PageID.6810; ECF No. 436 at PageID.7124).

The Court finds that Defendants paid for the prototype but not the idea contained within the prototype, which allowed Defendants to progress to the design and development stage. Because Defendants paid only for the prototype rather than the idea that made the final product possible, the Court finds that Nartron can proceed on its breach of contract claim for the period until November 2009. After this time, when the project entered a new phase, as the ICS automotive application with capacitive touch technology assumed more definitive shape, Nartron no longer provided know-how on the project. *Oldnar*, 766 F. App'x at 265. Because the Court finds no liability and damages after November 2009, Count II's unjust enrichment claim (ECF No. 57) must be dismissed. *See Oldnar*, 766 F. App'x at 266.

Accordingly,

**IT IS HEREBY ORDERED** that the parties shall not later than July 20, 2022 file a Joint Notice setting forth their recommendations for further proceedings on Nartron's breach of contract claim.

**IT IS FURTHER ORDERED** that Nartron's Count II Unjust Enrichment claim (ECF No. 57) is **DISMISSED** because the Court finds no liability and damages after November 2009.

Dated: July 6, 2022

/s/ Janet T. Neff
JANET T. NEFF
United States District Judge