UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

OLDNAR CORPORATION, f/k/a
NARTRON CORPORATION,

    Plaintiff,

v.

SANYO NORTH AMERICA
CORPORATION, et al.,

    Defendants.
_____/

Case No. 1:13-cv-1064

HON. HALA Y. JARBOU

## OPINION

Plaintiff Oldnar Corporation (formerly known as Nartron Corporation) ("Nartron") brought this action against Defendants Sanyo North America Corporation and Panasonic Corporation of North America seeking recovery related to the development of touchscreen technology used in motor vehicle dashboards. Following an evidentiary hearing, Judge Janet T. Neff found that Sanyo breached an agreement between Sanyo and Nartron by using Nartron's know-how without authorization. (7/6/2022 Op. & Order 6-8, ECF No. 439.) The sole issue remaining is to determine the proper measure or damages for the breach. The parties have fully briefed the matter. After reviewing the record, the Court will award Nartron nominal damages.

### I. BACKGROUND

This case has a lengthy history. In 2008, Sanyo sought a contract with General Motors ("GM") to be the production supplier of the Cadillac User Experience ("CUE") touchscreen center console system for Cadillac vehicles. *Oldnar Corp. v. Panasonic Corp. of N. Am.,* 766 F. App'x 255, 257 (6th Cir. 2019). The contract with GM was vital for Sanyo to remain in the supply

industry for touch integrated centerstacks, so Sanyo sought assistance in securing the contract from various suppliers of capacitive (i.e., no tactile pressure) touchscreen technology. It ultimately chose Nartron based on Nartron's reputation and "know-how" in the industry. *Id.* On April 2, 2008, Sanyo and Nartron entered into a four-year Development and Supply Agreement ("DSA") to develop a touchscreen console to sell to an original equipment manufacturer like GM. (*See* DSA, ECF No. 32-2.)

To win the contract with GM, Sanyo had to advance through a four-step process: "(1) proof-of-concept development phase; (2) advanced development—feasibility of application phase; (3) design and development supplier nomination phase/preproduction purchase order; and (4) production purchase order." (7/6/2022 Op. & Order 2.) With Nartron's help, Sanyo successfully made it through the first two phases of development. (*Id.*) During these two stages, Nartron showed Sanyo how the capacitive touch systems could work, developed at least fifteen prototypes, and participated in prototype demonstrations for GM. (*Id.* at 2-3.) In particular, "Nartron was the lead demonstrator of the idea that charge transfer sensing was effective in meeting the needs of the project" because such technology could transfer user input "through a thick plastic face plate, including with gloved-hand subjects." (*Id.* at 2.)

The DSA provided that Sanyo could designate Nartron as the manufacturer or supplier of the touchscreen system for GM under a "Product Agreement" between Sanyo and Nartron; however, the parties never entered such an agreement. *Oldnar Corp.*, 766 F. App'x at 258. Instead, in November 2009, Sanyo informed Nartron that it would not use Nartron's technology for the third and fourth phases of development. *Id.* at 259. Shortly thereafter, Sanyo selected Atmel as the project supplier—along with its microchip Application Specific Integrated Circuit ("ASIC") capacitive touchscreen technology—due to various considerations, including cost,

2

quality, scalability, and supplier readiness. (7/6/2022 Op. & Order 4.) Nartron "never delivered a timely, integrated solution, and the effectiveness of Atmel's technology . . . eventually eclipsed Nartron's." (*Id.* at 5.) Nartron's models "remained embryonic and inapt for production and scaling." (*Id.* at 7.) GM later awarded the contract to Sanyo, and Atmel's capacitive technology went into the production of Sanyo's console system for GM. (*Id.* at 5.) Nartron provided no further know-how on the project after November 2009. (*Id.* at 4.)

Sanyo paid Nartron approximately $55,000.00 for one working prototype that it presented to GM in July 2009, but that purchase did not include the sale of Natron's intellectual property rights evident in the prototype, such as Nartron's know-how. (*Id.*)

Nartron brought this action asserting claims for breach of contract and unjust enrichment against Sanyo, and for unjust enrichment against Panasonic, a successor to Sanyo. Regarding the contract claim, Section 9.3 of the DSA prohibited Sanyo from using Nartron's intellectual property rights without written consent to do so "in the form of a separately executed Product Agreement and a separately executed license agreement." *Oldnar Corp.*, 766 F. App'x at 264-65. No Product Agreement or relevant license agreement existed, so any intellectual property of Nartron that Sanyo used was in violation of the DSA. *Id.* at 265. Accordingly, the Court of Appeals instructed this Court to determine (1) "what Intellectual Property owned by Nartron, if any, was used by Sanyo in violation of section 9.3" and (2) "the appropriate measure of damages that Nartron might be able to recover" for such a breach. *Id.* Two other issues remained. Regarding the unjust enrichment claim, the Court of Appeals determined that Nartron had a possible claim for damages against Sanyo after the DSA expired[1] up to the time Sanyo merged with Panasonic, i.e., from April 3, 2012, to March 31, 2015. *Id.* at 266. Accordingly, it instructed this Court to determine what

---

[1] Generally, claims for unjust enrichment do not lie where there is an express contract covering the same subject matter. *See Oldnar*, 766 F. App'x at 265.

3

damages would be available to Nartron after the DSA expired on April 2, 2012. Finally, the Court of Appeals concluded that Nartron might have a viable claim for unjust enrichment against Panasonic because Panasonic was never a party to the DSA. *Id.* at 267.

After holding an evidentiary hearing, Judge Neff clarified the intellectual property at issue, concluding that Sanyo had used Natron's *know-how* without authorization, in violation of Section 9.3 of the DSA. (7/6/2022 Op. & Order 8.) This know-how consisted of "how the capacitive touchscreen technology could work in the [console] through the charge transfer method." (*Id.* at 7.)

Regarding unjust enrichment, Judge Neff found "no liability and damages after November 2009," ostensibly because Nartron provided no know-how to Sanyo after that date. (*Id.* at 8.) Also, at that point, the project "entered a new phase" with Atmel's technology providing a "more definitive shape" for Sanyo's product. (*See id.*) In other words, after November 2009, Sanyo no longer needed or used Nartron's know-how. Accordingly, Judge Neff dismissed the unjust enrichment claim against Sanyo and Panasonic because the only improper conduct at issue took place while the DSA was still in effect and before Sanyo's merger with Panasonic.

Judge Neff then ordered the parties to submit "their recommendations for further proceedings on Nartron's breach of contract claim." (*Id.* at 9.) She allowed the parties to engage in limited discovery with respect to damages and ordered them to submit briefs explaining their proposed damages methodologies. After that briefing was complete, Judge Neff took inactive status and this matter was assigned to the undersigned.

At issue before the Court is the appropriate measure of damages to Nartron for Sanyo's use of the know-how in breach of the DSA.

4

## II. ANALYSIS

Nartron is entitled to damages that place it "in as good a position as if the contract had been fully performed." *Oldnar Corp.,* 766 F. App'x at 265 (quoting *Corl v. Huron Castings, Inc.*, 544 N.W.2d 278, 280 (Mich. 1996)). In other words, Nartron is entitled to be placed in as good a position as if Sanyo did not use Nartron's know-how in violation of Section 9.3 of the DSA.

Nartron contends that it is entitled to a 10% royalty on the revenue Sanyo realized from sales of the touchscreen system supplied to GM. In support, Nartron relies on Section 9.3 of the DSA, which required payment of a "royalty or other fees" for use of the other party's intellectual property. (DSA § 9.3.) That provision provides, in full:

> Except as specifically authorized in this DSA, neither party may use Existing Property Rights or New Property Rights belonging to the other Party without the prior written consent of the other Party in a separate license agreement and then payment of any royalty or other fees set forth in that license agreement as identified in the Product Agreement. For the purpose of clarification, notwithstanding anything contrary herein, Nartron is not authorized to use any intellectual property rights owned by Sanyo's parent or other affiliated companies unless otherwise authorized in a separate license agreement and Sanyo is not authorized to use any intellectual property rights owned by Nartron's parent or other affiliated companies unless otherwise authorized in a separate license agreement.

(*Id.*)

As indicated above, the phrase "royalty or other fees" in Section 9.3 expressly refers to a royalty or fee set forth in a "license agreement as identified in the Product Agreement." (*Id.*) In other words, Section 9.3 contemplated that Sanyo would pay Nartron a royalty or fee for the use of Nartron's intellectual property in the touchscreen system supplied to GM for the CUE. But that use never occurred. Nartron's intellectual property did not become part of that system, so no license agreement with Nartron was needed for Sanyo or Panasonic to supply its system to GM. Thus, Section 9.3 does not suggest that Nartron is entitled to a royalty based on the sales of that system.

Nartron relies on Section 5.2 of the DSA as the basis for its 10% royalty calculation, but that provision is also inapplicable. When discussing the parties' obligations with respect to Products and Product Agreements, Section 5.2 provides for what happens when "one of the Parties is unable to deliver acceptable Products on-time":

> [T]he Parties agree to assist each other in identifying an alternate supplier, acceptable to the Lead Party, to assure uninterrupted Product supply. The Parties also agree to license to the other Party all industrial and intellectual property owned by the Party that is necessary for the Party to make or have made such Product(s). Unless otherwise defined in a product agreement the license is at 10% of the "Lead Parties System" sale price to a customer of the "Parties System" or any variants made.

(DSA § 5.2.) In the foregoing, "Products" refers to products identified in a Product Agreement, and "Parties System" is the completed system or product that would be sold by Nartron and Sanyo to an original equipment manufacturer like GM. (*See id.* § 5.1.) In other words, Section 5.2 sets a default royalty rate for the use of the other party's intellectual property in a Product, in the event the parties needed to find another supplier to make the Product. But the parties never jointly developed a viable system to sell to GM, they never entered into a Product Agreement, and Nartron's know-how did not become part of the system supplied to GM. Thus, Section 5.2 does not apply.

No other provision of the DSA contemplates payment to Nartron of a revenue-based royalty for Sanyo's use of Nartron's intellectual property, let alone a royalty for intellectual property that did not become part of a Product subject to a Product Agreement. Simply put, Nartron did not bargain for such a royalty in these circumstances.

True, Nartron's know-how "was a proximate cause of Defendants' advancement through [two of the four] development stages" (7/6/2022 Op. & Order 7-8); however, that know-how is not what ultimately allowed Defendants to secure a supply contract with GM. Defendants obtained that contract after spending an additional $4 million over 16 months developing technology

6

provided by Atmel. (8/5/2020 Evid. Hr'g Tr. 74, 167, ECF No. 433.) It makes little sense to compensate Nartron for a revenue stream that it was unable to secure for Sanyo, let alone a 10% royalty that the parties expressly conditioned upon events that did not come to pass. Contrary to Nartron's assertion, the royalty in Section 5.2 is not the best evidence of the value the parties placed on Nartron's know-how. Rather, it is evidence of the value of that know-how when needed to make a product that would be supplied to GM. But Sanyo did not need Natron's know-how for that purpose. Giving Nartron such a royalty would not put it in as good a position if the breach had not occurred. Instead, it would provide a windfall to Nartron.

Similarly, Judge Neff concluded over two years ago that "royalty damages do not apply" because Atmel's technology, not Nartron's, went into production of the CUE. (7/25/2022 Order 1, ECF No. 441.) "Under the law of the case doctrine, findings made at one point in the litigation become the law of the case for subsequent stages of that same litigation." *Hayden v. Rhode Island*, 13 F. App'x 301, 302 (6th Cir. 2001). "[C]ourts should not 'reconsider a matter once resolved in a continuing proceeding.'" *Howe v. City of Akron*, 801 F.3d 718, 739 (6th Cir. 2015) (quoting 18B Charles Alan Wright, et al., Federal Practice and Procedure: Jurisdiction and Related Matters § 4478 (4th ed. 2015)).

The Court does not deny that Nartron's know-how had some value. It aided Sanyo's progress in the development of a product for GM. Also, Sanyo purchased a prototype containing Nartron's know-how for demonstration purposes. However, Nartron does not adequately explain how to calculate the value of that know-how that is consistent with the DSA and the parties' reasonable expectations. Nartron provided its know-how to Sanyo so that the two of them could develop a viable touchscreen system for GM, yet Nartron never delivered a workable solution utilizing its idea; even its prototype was "inapt" for production. (*See* 7/6/2022 Op. & Order 7.)

7

Sanyo needed Atmel's technology to achieve its goal and recoup its investment in the project. In these circumstances, the 10% royalty rate in the DSA is not the proper measure of damages for Sanyo's breach.

Nartron bears the burden of proving damages with "a reasonable degree of certainty for the calculations as opposed to their being conjectural or speculative." *Allen v. Mich. Bell Tel. Co.*, 232 N.W.2d 302, 305 (Mich. Ct. App. 1975). It has not met that burden here. Its proposed royalty is arbitrary and inconsistent with the parties' expectations. Nartron has not shown that such a royalty is reasonably tied to the value of the know-how, to any harm suffered by Nartron, or to the benefit received by Sanyo from its use of that know-how.

Defendants argue that because Nartron cannot prove any damage, there is no breach of contract. Not so. Judge Neff already determined that Sanyo violated Section 9.3 of DSA. Nartron was damaged because Sanyo used its know-how outside the terms of their agreement. That know-how had some value to Sanyo, and considering the restriction in Section 9.3, Nartron can reasonably claim it is entitled to receive some benefit for Sanyo's unauthorized use of it. Thus, the issue is not the absence of damages but Nartron's failure to provide a means to calculate its damages with a reasonable degree of certainty.

Nominal damages are appropriate here. *See Pagan v. Village of Glendale*, 559 F.3d 477, 478 n.1 (6th Cir. 2009) ("Nominal damages are a symbolic recognition of harm that may be awarded without proof of actual harm and 'have only declaratory effect.'" (quoting *Morrison v. Bd. of Educ.*, 521 F.3d 602, 610 (6th Cir. 2008))); *Vandenberg v. Slagh*, 114 N.W. 72, 75 (Mich. 1907) ("In actions for breach of contract, nominal damages are recoverable upon proof of the breach but in order to recover substantial damages the plaintiff must offer evidence from which the loss can be computed with reasonable certainty." (citation omitted)).

## III. CONCLUSION

Based on the foregoing, the Court will award Nartron $1.00 in nominal damages.

A separate judgment will issue.


Dated: March 20, 2025                             /s/ Hala Y. Jarbou
                                                  HALA Y. JARBOU
                                                  CHIEF UNITED STATES DISTRICT JUDGE